UNITED STATES of America,
Plaintiff-Appellee,

v.

Wilber N. OLANDER, William Dolman, Denne M. Harrington, Gary D. Rondeau, Gerald L. Minnich, Arthur Schruder, and Roy D. Wilson, Defendants-Appellants.

Nos. 77–3794, 77–3925, 78–1239, 78–1240, 78–1310, 78–1311 and 78–1312.

United States Court of Appeals,
Ninth Circuit.

Sept. 7, 1978.

Rehearing and Rehearing En Banc
Denied Oct. 27, 1978.

Charles E. Yates (argued) of Moriarty, Long, Mikkelborg & Broz, John C. Merkel, U. S. Atty., Seattle, Wash., Robert M. Taylor, Asst. U. S. Atty. (argued), Dept. of Justice, Washington, D. C., Craig Hayes (argued) of McCush, Kingsbury, O'Connor, Ludwigson, Thompson & Hayes, Bellingham, Wash., for defendants-appellants.

James W. Moorman, Dept. of Justice, Washington, D. C., Kathryn A. Oberly (argued), Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before DUNIWAY and CHOY, Circuit Judges, and GRANT,* District Judge.

DUNIWAY, Circuit Judge:

These seven appeals have been consolidated and were all heard on the same day, although some were separately argued. We dispose of all of them in this opinion. In each case except that of Olander, we affirm. In Olander's case, we reverse.

## I. BACKGROUND APPLICABLE TO ALL APPEALS.

All of these cases arise from the efforts of the United States District Court for the Western District of Washington to enforce its decree in *United States v. Washington,* W.D.Wash., 1974, 384 F.Supp. 312, aff'd, 9 Cir. 1975, 520 F.2d 676, *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97. The district court, finding its decree opposed and frustrated by the executive and judicial departments of the State of Washington, and by the organized and vocal defiance of the commercial fishermen in the State of Washington, felt compelled to implement its judgment by the issuance of an injunction. That injunction regulates fishing for salmon in Puget Sound and certain other areas by non-Indian ("non-treaty") commercial fishermen for the purpose of assuring to Indian ("treaty") fishermen the opportunity to catch their share of salmon as determined in the court's original judgment.

The court's injunction, issued September 27, 1977, provides in material part:

1. All Puget Sound and other marine waters easterly of Donilla Point-Tatoosh line and their watersheds, all Olympic Peninsula watersheds, and all Grays Harbor and its watersheds are hereby closed to all net salmon fishing except during such times and such specific waters as are opened by State or tribal regulations or regulations of the United States conform-

ing to the orders of this Court in this case.

2. All reef net, gill net and purse seine fishermen licensed by the State of Washington, all other persons who attempt to net or assist in netting salmon in the waters described in paragraph 1, the Puget Sound Gillnetters Association, the Purse Seine Vessel Owners Association, the Grays Harbor Gillnetters Association and all persons in active concert or participation with them are hereby enjoined and prohibited from engaging in taking, possessing, or selling salmon of any species taken from such waters, unless such person has first ascertained from the Washington Department of Fisheries telephone "hot-line", 1–800–562–5672 or 1–800–562–5673, that the area to be fished is open for fishing by non-treaty fishermen at the time the individual intends to fish, *provided,* that this provision shall not apply to persons exercising treaty fishing rights in accordance with the orders of this Court.

3. The defendant State of Washington is directed to maintain a continuous telephone hot-line service free of charge to any caller from within the State of Washington to provide information on areas within the waters described in paragraph 1 of this order that are open to net salmon fishing by non-treaty fishermen in conformity with the orders of this Court. The defendant shall furnish to this Court and to the United States Attorney a transcript of the daily hot-line messages.

In *Puget Sound Gillnetters Association v. United States District Court,* 9 Cir., 1978, 573 F.2d 1123, the Gillnetters Association, by petition for a writ of mandamus, and the State of Washington, by appeal, attacked this injunction. We upheld it against all of the attacks there presented to us.

The cases now at bar arise from the attempts of the United States to enforce the injunction by means of criminal contempt

---

* The Honorable Robert A. Grant, Senior United States District Judge of the United States Dis- trict Court for the Northern District of Indiana, sitting by designation.

proceedings. In each case, the appellant, a commercial fisherman, was found fishing for salmon by the use of a gill net, in an area which, at the time, had been declared to be closed on the "hot-line" mentioned in the injunction. Each appellant had been previously found in an area similarly declared to be closed and had then been personally served with a copy of the injunction and told that he must comply with paragraph 2. Each was charged, in an order to show cause procured by the United States attorney and signed by the judge, with violating 18 U.S.C. § 401(3), found guilty in a trial to the court, and sentenced to 60 days in jail. Each is free on personal recognizance.

With the foregoing as background, we proceed to consider the appeals that are before us. We consider the appeals in the chronological order in which the convictions occurred.

## II. DOLMAN–No. 77–3925.

Dolman was found fishing with a gill net in a closed area on September 30, 1977, three days after the injunction was issued. A National Marine Fisheries officer served a copy of the injunction on him, read paragraph 2 to him, was told by Dolman that he understood it, and warned Dolman that if he again fished in a closed area as ascertained from the hot-line, he could be cited for contempt of court. On October 4, Dolman was again found fishing with a gill net in such a closed area and was served with a citation. Thereafter, an order was issued requiring him to show cause why he should not be punished for criminal contempt. After a full hearing, he was found guilty and sentenced to serve 60 days in jail, on November 22, 1977. We consider his six claims of error.

A. *Claims governed by prior decisions of this court.*

1. *That the treaties with the Indians are not self executing and cannot be enforced by the District Court.*

This notion was rejected by us in *United States v. Washington, supra,* 520 F.2d at 684–85, 687, which we reaffirmed in our *Puget Sound Gillnetters* case, *supra,* 573 F.2d at 1126–27, 1130 n. 9.

2. *That the injunction cannot be enforced against Dolman because he was not a party to United States v. Washington.*

■ This argument was rejected by us in our *Puget Sound Gillnetters* case, *supra,* 573 F.2d at 1132–33.

B. *The claim that due process was denied in that there was non-compliance with Rule 65, F.R.Civ.P. and the injunction is not specific enough.*

The applicable portion of Rule 65 is 65(d):

(d) Form and Scope of Injunction or Restraining Order. Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; . . .

Dolman argues that the injunction, the operative portions of which are quoted at page 879, *supra,* incorporates by reference other documents, namely, Washington Department of Fisheries Regulations, Tribal Regulations, U.S. Regulations, Department of Fisheries Hotline, and a court order issued in *United States v. Washington.* We find no such incorporation, and counsel does not tell us where he finds it.

All that the injunction requires a fisherman to do is to call the hot-line before going fishing, and then to refrain from fishing in any area which the hot-line tells him is closed. We find paragraph 2 clear, concise, and comprehensible. That is the only paragraph that Dolman was required to obey. We find nothing in paragraph 1 that conflicts with paragraph 2. Paragraph 1 does not purport to authorize fishing in waters declared open by state or tribal or United States regulations. It merely declares that all relevant waters are closed

except those opened by such regulations. But it does not do what counsel says it does, that is, require fishermen to know those regulations and follow them. Instead, all it requires is, in paragraph 2, that the fisherman comply with what the hot-line tells him about open or closed waters. If the hot-line tells him that an area is closed, he is not to fish there; if it tells him that an area is open, he may fish there.

The injunction is as specific as the nature of the subject matter—regulation of fishing in Puget Sound—permits. *See Puget Sound Gillnetters, supra,* 573 F.2d at 1133, n. 16; *McComb v. Jacksonville Paper Co.,* 1949, 336 U.S. 187, 191–92, 69 S.Ct. 497, 93 L.Ed. 599; *Gulf King Shrimp Co. v. Wirtz,* 5 Cir., 1969, 407 F.2d 508, 517; *Seagram-Distillers Corp. v. New Cut Rate Liquors, Inc.,* 7 Cir., 1955, 221 F.2d 815, 820–21.

■ The notion that non-Indian commercial fishermen derive their fishing rights from the treaties, and so are all within the proviso of paragraph 2 is, to say the least, far-fetched. As we pointed out in *Puget Sound Gillnetters, supra,* 573 F.2d at 1128: "The treaty fishers [i. e., the Indians] derive their rights from one of the cotenants, the tribes. The nontreaty fishers derive their rights from the other, the state as the successor to the United States." Again, at page 1132, we said: "[U]nder Washington law the citizen's right to take fish is purely derivative of the state's power to regulate rights in the fish." And we made it clear that the state's power is subject to the Indians' treaty rights.

The suggestion that a non-Indian fisherman who violates paragraph 2 may think that he is exercising treaty rights, "in accordance with the orders of this court," under the proviso at the end of paragraph 2, is too far-fetched to warrant serious consideration.

C. *The claim that the evidence is insufficient to sustain the conviction.*

■ This claim borders on the frivolous. It is first asserted that the government failed to prove that Dolman was not a person exercising treaty fishing rights with-

in the proviso to paragraph 2 of the injunction. The government had no such burden. It was Dolman's burden to bring himself within the proviso if he could. *Hockenberry v. United States,* 9 Cir., 1970, 422 F.2d 171, 173; *United States v. Barrios,* 9 Cir., 1972, 457 F.2d 680, 681. He made no effort to do so.

■ Counsel's endeavor to turn Dolman's defiant statement to the Fisheries officer, "I will be out here fishing any night that the Indians can fish," into evidence that Dolman was an Indian and entitled to fish is a bit of pettifoggery.

■ The contention that there is no evidence that Dolman knew that he was violating the injunction is equally fallacious. A copy was handed to him on September 30; paragraph 2 was read to him; he said that he understood it. He made no claim, on October 4, that he was not violating the injunction, or that he did not know that he was violating it. There is ample evidence from which to infer that he did know. It shows that if he had called the hot-line he would have learned that the area was closed. And if he had not called the hot-line, that, too, would be a violation of paragraph 2.

D. *The claim that Dolman was entitled to a jury trial.*

■ The charge was violating 18 U.S.C. § 401(3), which authorizes imprisonment, but does not prescribe any specific term of imprisonment. Under these circumstances, a jury trial is required only if the actual sentence exceeds six months. *Frank v. United States,* 1969, 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162. Dolman's reliance upon 18 U.S.C. § 3691, which provides for a jury trial in certain contempt cases is misplaced. That section does not apply to "disobedience of any lawful writ . . . entered in any suit . . . brought or prosecuted in the name of, or on behalf of, the United States." *United States v. Washington, supra,* in which the injunction was entered, is such a case. The United States brought that action; it was no mere nominal party.

### E. *The claim that the judge should have disqualified himself.*

Dolman filed a motion to disqualify Judge Boldt "pursuant to 28 U.S.C. 455," together with an affidavit of his counsel which has attached to it an article that appeared in the Seattle Post-Intelligencer of September 20, 1977.

28 U.S.C. § 455 was amended in relevant part in 1974 to provide:

(a) Any . . . judge . . . shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party . . . .

The 1974 amendments to § 455, with minor changes, effectively enacted Canon 3 C of the American Bar Association Code of Judicial Conduct into law. When the ABA adopted the Code in 1972, it incorporated the language of 28 U.S.C. § 144 requiring recusal whenever a judge "has a personal bias or prejudice" against a party into Canon 3 C, "Disqualification," (1)(a), "personal bias or prejudice concerning a party." The 1974 amendments to § 455 simply repeated this language. Accordingly, the decisions interpreting this language in § 144 are controlling in the interpretation of § 455(b)(1). *See United States v. Hall,* N.D.Okl., 1975, 424 F.Supp. 508, 533, *aff'd,* 10 Cir., 1976, 536 F.2d 313; 13 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3542, at 345–46 (1975); *see generally United States v. Azhocar,* 9 Cir., 1978, 581 F.2d 735.

The similarity of § 455 to Canon 3 C also extends to subsection (a) of § 455. Both Canon 3 C(1) and § 455(a) provide for a judge's disqualification in any proceeding "in which his impartiality might reasonably be questioned." In Canon 3 C(1)(a) this language explicitly includes, but is not limited to, cases of personal bias and prejudice. It is less clear that the language of § 455(b)(1) was intended to be subsumed in § 455(a), for subsection (b)(1) is prefaced by the phrase "[a judge] shall *also* disqualify himself in the following circumstances: . . . ." (emphasis added). But the addition of this phrase is described in the legislative history as "a technical change," and § 455(a) is characterized as a "general, or catch-all, provision." H.R.Rep. No. 93–1453, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 6351, 6354. In view of this, and because subsection (b)(1) expressly deals with disqualification for bias or prejudice, it would be incorrect as a matter of statutory construction to interpret § 455(a) as setting up a different test for disqualification for bias or prejudice from that in § 455(b)(1). This is especially so because both the drafters of the Code and the Congress in adopting subsection (b)(1) were careful to follow the language of § 144. *See* Frank, Commentary on Disqualification of Judges—Canon 3 C, 1972, Utah L.Rev. 377, 380 (section 144 has "been construed so narrowly as to require the clearest sort of direct personal bias against a party. The new Canon gingerly enters this field [and] makes no waves").

We agree with the Fifth Circuit that there is "no suggestion in the legislative history" that by the 1974 amendment of § 455, the decisions interpreting the bias and prejudice language of § 144 "were being overruled or in anywise eroded," and with that court's conclusion that the test for bias or prejudice is the same under both statutes. *Davis v. Board of Commissioners,* 5 Cir., 1975, 517 F.2d 1044, 1052.

Dolman's § 455 motion asserts that the injunction he was charged with violating "has been identified in the public mind as the result of actions taken by Judge Boldt as the 'Boldt Decision.'" This ground is so obviously lacking in merit as not to warrant further consideration.

The newspaper article attached to defense counsel's affidavit, with the byline of Fred Brack, is headed "Federal Agents Carry Burden of Enforcing Boldt Decision." In it, the writer states that although the judge had ordered both state and federal agents to enforce his judgment, only federal agents were doing so. The article then continued:

"The state is going to have to establish their enforcement credibility with the fishing community," said Wayne Lewis, chief enforcement officer in this area for the National Marine Fisheries Service.

"They lost it last year. This was a perfect time for them to get it back. The state was saying it couldn't get a conviction in state court for a violation. *Judge Boldt said, okay, you set the regulations (protecting treaty rights) and bring the violators before me and I'll convict them.*

"All of us in the federal government are extremely disappointed that the state is not helping in this enforcement effort." (emphasis added)

The balance of the article discussed reasons why the state was not enforcing the regulations.

Counsel for Dolman based his argument for disqualification on the emphasized sentence, and argues that it shows, at least *prima facie*, that Judge Boldt is disposed to convict anyone who is accused of violating the injunction. The language, however, in context, appears to be merely a layman's way of saying that Judge Boldt had decided that if the state would not enforce his decree, he would enforce it himself.

Counsel for Dolman subpoenaed the reporter, Mr. Brack. In an affidavit, he stated that "the quote of Mr. Lewis in the news article is accurate, and it was not understood by me to be a quote of Judge Boldt. Rather, the statement counsel attributes to Judge Boldt quite simply is a figurative interpretation by Mr. Lewis of what any judge might do if his orders were violated." On cross-examination, he testified that the language quoted was an accurate report of what Mr. Lewis had said, but that he, Brack was not quoting or purporting to quote Judge Boldt, as the lack of inner quotations indicated. His testimony is:

If I had understood that Mr. Lewis was actually, literally quoting Judge Boldt, that would have been the lead sentence in the paragraph. And the story would have been on page one and probably would have been the lead story in the newspaper.

[A]s I wrote the sentence after talking with Mr. Lewis, there was no understanding on my part at all that in the article I was quoting Mr. Lewis as quoting Judge Boldt. There are no interior quotations.

Mr. Lewis was called by the government. He testified that he had never met Judge Boldt, had never had any conversation with Judge Boldt, and that he had only seen him once, about a year and a half or two years before, when he was in the courtroom as an observer. Finally, he testified:

Q Mr. Lewis, have you ever heard Judge Boldt·say to bring the violators before him and he would convict them?

A No.

Q Have you ever heard anyone else say that Judge Boldt said that?

A No.

 It was not improper for Judge Boldt to pass on the motion to disqualify. The law is clear that he must determine whether the affidavit is sufficient, if true, to require that he recuse himself. Only if he finds it thus sufficient is he required to have another judge hear the motion. *See United States v. Azhocar,* 9 Cir., 1978, 581 F.2d 735 at 738. The affidavit in this case was not sufficient.

In *Azhocar,* we said:
And as observed in *United States v. Mitchell,* 377 F.Supp. 1312, 1315–16 (D.D. C.1974), "[o]nly the individual judge knows fully his own thoughts and feelings and the complete context of facts alleged." This is a valid consideration, since inquiry into the circumstances surrounding the presumptively true allegations is often appropriate in determining whether they are such as would prevent a fair decision on the merits. *See, e. g., Los Angeles Trust Deed & Mortgage Exchange v. SEC,* 285 F.2d 162, 176 (9th Cir. 1961) ("a thorough reading of the record" did not substantiate the affiant's position).
(581 F.2d at 738).

These considerations are· applicable here. Moreover, counsel did not ask that another

judge hear his motion. Instead, he subpoenaed the author of the article, whose testimony sustains our view that the article does not purport to quote Judge Boldt. This conclusion is further strengthened by the testimony of Mr. Lewis, who flatly denied ever hearing Judge Boldt say what the article says he said.

In the light of the foregoing, we find counsel's pious argument about what Judge Boldt should have done somewhat offensive.

The judgment of conviction of Dolman should be affirmed.

### III. OLANDER—No. 77–3794.

Olander's only argument is that the evidence is not sufficient to sustain the conviction, which occurred on November 18, 1977. We therefore state the evidence in some detail.

On Saturday, October 8, 1977, at 12:30 p. m. message 53 was placed on the hot-line. It reads in pertinent part:

Area . . . 13A (Carr Inlet) [is] open to gill nets Sunday through Wednesday nights.

This remained in effect until it was replaced by message 54 at 5:30 p. m. Sunday, October 9. That message says, in pertinent part:

In accordance with a federal court order received by the Fisheries Department October 8, we caution all fishermen that any non-treaty fisherman who fishes for salmon in any area . . . except for areas 7, 7A, and 7B, shall be subject to the contempt powers of the United States District Court.

Message 55 came on the hot-line at 9:00 a. m. Tuesday, October 11, and contained essentially the same message. So did message 56, which came on the hot-line at 1:00 p. m. Tuesday, October 11.

On the morning of October 4, 1977, federal Fisheries Agent Breese found Olander fishing in area 10–A. His vessel carried nothing identifying it as a treaty Indian vessel. Olander was using a gill net. Breese and another agent went on board and served a copy of the injunction on Olander, who did not, in response to a question, claim to be a treaty Indian fisherman. Early on the morning of October 13, 1977, at about 1:00 a. m., Fisheries Agent Gibler found Olander fishing with a gill net in Area 13–A. He had eight salmon on board. Gibler then testified, in response to a question as to what Olander told him "with regard to the hot-line," as follows:

Well, this was on a Thursday morning, October the 13th. And after ascertaining that Mr. Olander had been boarded by our agent, previously, had been served with a copy of the preliminary injunction dated September 27th, asked Mr. Olander why he was out fishing in a closed area in a closed period. And he stated that he had called the hot line on Sunday, which was October the 9th at 9:30 A.M. And at that time the hot line had indicated the area was open. And he had since had not contacted the hot line since that Sunday morning.

Gibler then testified that it was his experience that the messages on the hot-line changed frequently—"I have seen them change twice in the same day. I couldn't give you the dates, but they are constantly changing from day to day."

Gibler gave Olander a citation, and Olander signed it, writing above his signature "Guilty of being non-Indian." Olander made no effort to hide the fish that he had caught. He made no efforts to prevent the agents from boarding. He admitted having been served with the injunction. He told the agents that he had not had an opportunity since Sunday morning to contact the hot-line again. He said that he had been staying on the boat, and that was the only reason that he gave why he hadn't contacted the hot-line in the additional time since Sunday. When the agents tried to photograph him, he objected, turned his back, and pulled his stocking cap down over his face. He did not otherwise interfere with the agents when they were taking photographs.

When exercising his right of allocution, Olander repeated, in more detail, what he told agent Gibler. He also, in response to

the judge's questions, said that he had had a number of years experience in fishing in Puget Sound, and detailed that experience. The judge then said:

> [I]t has been my impression of you since you first appeared here and responded to questions, that you are a very intelligent man, unusually so for one in that particular field of endeavor. So that you would be very well aware of a situation that should have alerted you to making a call while you were able to. And you didn't do that.
>
> You have not taken the witness stand, so, of course, your statement is not testimony. It is just your statement. And frankly, I find it very difficult to believe, that with all that background of experience, the length of time that you have been a commercial fisherman, that you could have possibly have made the effort that you should have made to be sure that you were fishing lawfully.
>
> And for that reason, I have found you guilty.

The judge did not have to believe Olander, whether he was under oath or not. Disbelief, however, does not always supply evidence of guilt. The foregoing statement of the judge, we think, is based on a misconstruction of the injunction. All that it requires is that a fisherman call the hot-line before he goes fishing, and ascertain whether the hot-line message says that the area where he proposes to fish is open. It is undisputed that Olander did this, and that the message on the hot-line told him that area 13–A would be open through Wednesday night. He was caught fishing there on Wednesday night. He was thus in compliance with the injunction. The injunction did not tell him that he must recheck the hot-line, much less that he must do so every day, or every 12 hours.

We hold that the evidence does not support the conviction, and that the conviction must be reversed.

### IV. HARRINGTON—No. 78–1239
### RONDEAU—No. 78–1240

Harrington and Rondeau were tried together, although they had been served with separate citations and orders to show cause and their cases were separately numbered. The evidence is undisputed that, on September 28, 1977, they were fishing on Harrington's boat and were each served with a copy of the injunction, and that on November 2 they were again fishing, on the same boat, in Area 7, which was then, according to the latest hot-line message, closed to commercial gill net fishing by non-Indians. Harrington was ordered to appear and show cause on January 12, Rondeau on January 17. On January 4, the court, on its own motion, continued Harrington's case until January 17. On January 17, the court tried the two of them together, and found them guilty. Only one of these appellants' claims of error goes to the merits of their convictions. We consider their claims of error seriatim.

### A. Consolidation of the Cases and Denial of a Motion to Sever.

It was not error for the court to continue the case of Harrington from the 12th to the 17th of January. The court has control of its own calendar, and no prejudice appears. Counsel received prompt notice, and Harrington and his counsel were present when his case was called.

It was not error to try the two charges together. Rules 8(b) and 13, F.R. Crim.P., fit these cases exactly. Harrington and Rondeau "participated in the same act or transaction"—they were together, fishing on Harrington's boat, when caught.

It was not error to deny defendants' motion to sever. This is a matter as to which the judge has considerable discretion. *United States v. Ellsworth*, 9 Cir., 1973, 481 F.2d 864, 870. There was no showing of prejudice made in support of the motion. The testimony of Fisheries agent Langvehn that Harrington said that he was fishing where he was because fishing wasn't very good in the open area, that Rondeau was his assistant, and commonly went fishing with him, that when "they" (he and Rondeau) saw "us" (the Coast

Guard boat) coming "they just rolled up the fish net and the whole works on the reel," and that "those fish were caught right there as we were approaching," was not unduly prejudicial to Rondeau. It was obviously admissible against Harrington.

■ Harrington took the stand and admitted that on October 7 the lights were off on his boat because he didn't want to be seen where he was fishing, in a closed area. He also testified that Rondeau "works on his boat once in a while," was "not a full time employee," and that Harrington, not Rondeau, decides where he will fish. Although no such claim was made below, counsel now says that he had anticipated that, if the trials were separate, Harrington would testify at Rondeau's trial that Rondeau had no control over where they would fish. The point need not be considered, not having been raised below, *Thomason v. Klinger*, 9 Cir., 1965, 349 F.2d 940. Moreover, Harrington did so testify.

■ Harrington was not forced to take the stand to testify for Rondeau; that was his choice. Moreover, this argument was not presented to the trial judge, either. Finally, any claim of violation of the rule in *Bruton v. United States*, 1968, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, disappeared when Harrington took the stand. *Nelson v. O'Neil*, 1971, 402 U.S. 622, 627, 91 S.Ct. 1723, 29 L.Ed.2d 222.

The court did not abuse its considerable discretion in denying the motion to sever. *See United States v. Adams*, 9 Cir., 1978, 581 F.2d 193 at 198; *United States v. Brady*, 9 Cir., 1978, 579 F.2d 1121 at 1128.

### B. *Disqualification of the Judge.*

■ The affidavits supporting the defendants' motions to disqualify the judge were each made by the attorney, not the defendant, and stated only:

> That his client believes that the Honorable George H. Boldt cannot be fair and impartial in a criminal contempt action against a nontreaty fisherman such as himself when the allegedly contemptuous acts of the Defendant, i. e., violation dated November 2, 1977, could be considered as having been done in open defiance of orders of Judge Boldt and as constituting a personal attack upon the dignity, and authority of Judge Boldt.

This is plainly insufficient. See Part II. E, *supra*.

### C. *Sufficiency of the Evidence.*

■ The argument that the evidence is insufficient is frivolous.

The judgments of conviction must be affirmed.

### V. MINNICH—No. 78–1310
### SCHRUDER—No. 78–1311
### WILSON—No. 78–1312

These three appellants were represented by the same attorney at trial and are also represented by him on appeal. He filed a single brief. We therefore consider their appeals together.

### A. *Facts.*

#### 1. *Minnich.*

On October 9, 1977, Minnich was found inside a closed area, and was served with the injunction. He said that he had also received a copy in the mail. On November 3, he was found fishing in an area designated as closed on the hot-line, and was given a citation. He was tried and found guilty on January 19, 1978.

#### 2. *Schruder.*

On October 12, 1977, Schruder was served with a copy of the injunction. On November 8, he was found fishing in a closed area. He denied that he had been served with the injunction, and was given another copy, along with a citation. He was tried and found guilty on January 24, 1978.

#### 3. *Wilson.*

On November 8, 1978, Wilson was served with a copy of the injunction. On November 19, he was found fishing in a closed area and given a citation. He was tried and found guilty on January 17, 1978.

Other facts as to each appellant will be stated where necessary as we consider the various arguments made by the appellants.

B. *The Issues.*

The appellants are represented by the same attorney who represented Dolman. Most of his claims of error are those urged on Dolman's behalf. These we have disposed of in Part II., A 1., 2., B, D, E. We reject them again. Only three claims of error merit further discussion.

1. *The Claim that the Judge Should Have Disqualified Himself.*

In each case, counsel filed a motion, his own affidavit, and an affidavit of his client. The client affidavits are identical, except for the client's name. Counsel's motion asserts that *United States v. Washington, supra,* has become identified in the public mind as the Boldt decision. His affidavit again cites the September 20, 1977 article in the Post Intelligencer that we have described in Part II. E, *supra.* He then adds a part of what the judge said to Olander when he sentenced him, as follows:

It has been my impression that you are a very intelligent man, unusually so for one in that particular endeavor (commercial fishing).

This is a partial quotation of a newspaper article about the convictions of Dolman and Olander. The full paragraph reads:

"It has been my impression," Boldt told Olander, "that you are a very intelligent man, unusually so for one in that particular endeavor," an awkward attempt, it appeared, to compliment Olander rather than insult other fishermen.

In each client affidavit, counsel has his client say, under oath:

The Honorable George Boldt has stated with reference to the orders he has issued attempting to prohibit commercial fishermen from fishing that the violators of those orders should be brought before him and that he will convict them. I know that Judge Boldt has made such a statement because it was attributed to him in an article published in the Seattle Post-Intelligencer on the 20th of September, 1977, on Page A–3.

\* \* \* \* \* \*

Despite the fact that there was no evidence to support a finding of guilty, the Honorable George Boldt found Mr. Olander guilty, stating that he knew he was guilty. Judge Boldt also indicated in the trial of Mr. Olander that commercial fishermen are generally not very intelligent people.

Apparently, counsel does not hesitate to have his client swear to things that he does not and cannot know.

We are particularly disturbed by these affidavits because, as we have shown in Part II. E, *supra,* a witness called by the same counsel in Dolman's case, in November, 1977, testified that his article was not a quotation of Judge Boldt, and the person quoted in the article testified in that case that he never heard Judge Boldt say, or anyone else say that he said, "to bring the violators before him and he would convict them." The affidavits were subscribed and sworn to in January, 1978. Judge Boldt made no comment on this bit of monkey business by counsel, but we feel free to express our strong disapproval of it.

Judge Boldt's comment to Olander, quoted in Part III., *supra,* at page 884, does not indicate any prejudice toward any of these defendants, any more than does the inaccurate quotation in the newspaper and in the affidavits set out above.

In Schruder's case there is an additional affidavit. It recites that Schruder had been involved in and been a leader in public attempts to have Judge Boldt impeached because of his "improper conduct" in *United States v. Washington,* that in these efforts Schruder had appeared in newspapers and on T. V., that there had been wide publicity and news coverage about the petitions for impeachment, that he is confident that Judge Boldt must know about them, and that Schruder does not believe he can get a fair trial.

This affidavit was not filed before trial. Counsel made an oral statement about it when the trial began, and Judge Boldt told him to prepare and file an affidavit that day, which was done. The affidavit purports to have been made pursuant to 28 U.S.C. § 144. It clearly was not timely, and Judge Boldt could have disregarded it for that reason. We also conclude, however, that, if timely, it is still not sufficient. It does not show the probability of the kind of personal prejudice of the Judge toward Schruder that would require disqualification. The affidavit does show that Schruder, because he does not like the decision in *United States v. Washington,* has lost his objectivity toward Judge Boldt. It does not show a comparable loss of impartiality on Judge Boldt's part. *United States v. Wolfson,* 2 Cir., 1977, 558 F.2d 59, 61–63. In that case, the showing in support of disqualification was stronger than that made here, and the court rejected it. We reject Schruder's showing here.

The claim that, because Olander's conviction must be reversed, Judge Boldt must be prejudiced against all commercial fishermen, is patently without merit. There was considerable evidence to make a *prima facie* case against Olander, but the case falls only because of the hot-line message upon which Olander said he relied, and our giving a somewhat more strict construction to the injunction than Judge Boldt gave it.

### 2. *The Claimed Denial of Discovery.*

Counsel's motion for discovery is the same in each case, and is broader than Rule 16, F.R.Crim.P., requires. The government moved to strike it, and the court granted the motion. We need not decide whether the court was technically correct in doing so, but we do find in the government's motion an offer to disclose most of the matters mentioned, upon request by the defendant. No such request was made. Be that as it may, counsel is unable to point to anything that happened, to his clients' prejudice, as the result of the striking of his discovery motions.

Counsel's claim that the court delegated to the prosecutor the right to decide whether to grant discovery is nonsense. All that he can point to is a statement by the court, in response to counsel's remark that the prosecutor's method of practicing law was substantially different from counsel's, that the court was relying on the prosecutor's viewpoint. Courts normally look to counsel to present their views as to the law, and rely on the presentation that the court thinks correct. The court's caution to the prosecutor that, if there were a portion of the rules of special significance, the prosecutor should tell him, because he was relying on what the prosecution said about them, was perfectly proper.

### 3. *The Claim that the Boarding of the Defendants' Vessels to Serve the Injunction Violated the Defendants' Rights under the Fourth Amendment.*

This claim is made on behalf of each defendant. It is made only about the first boardings, when the injunction was served; it is not made about the second boardings, when the defendants were found fishing in violation of the injunction. It is without merit.

There is a material difference between boarding a boat for the purpose of searching it and proceeding to do so, which did not happen here, and boarding to serve civil process, which did happen here. There is no violation of the Fourth Amendment when an officer comes upon private property to serve legal process, so long as there is no breaking or entering of a dwelling or other building of a type protected by the Amendment. There is no search or seizure in such a case. So here, merely boarding to serve process is neither a search nor a seizure, and no search or seizure occurred after the boarding. Coming onto the deck of the boats is like coming onto a lot where a house is situated, or onto the porch or landing of the house. Nothing in the Fourth Amendment prohibits handing process to a man, in a peaceable manner, on his property, including his boat. To hold that it does would be an extravagant extension of the Fourth Amendment.

The judgments in each of the three cases must be affirmed.

In No. 77–3925, *Dolman,* No. 78–1239, *Harrington,* No. 78–1240, *Rondeau,* No. 78–1310, *Minnich,* No. 78–1311, *Schruder,* and No. 78–1312, *Wilson,* the judgments are affirmed.

In No. 77–3794, *Olander,* the judgment is reversed.