In the Matter of the HAWAII CORPORATION, Debtor.

John T. GOSS, Trustee of the Estate of the Hawaii Corporation, Plaintiff,

v.

Randolph CROSSLEY; Denis Alexander; R. A. Anderson; John A. Calfas; George Q. Cannon; Henry D. Clarke, Jr.; Samuel A. Cooke; Homer O. Croasmun; James F. Deane; Claire DeVault; Jon T. Eicholtz; William C. Erickson; George Freitas; Sandford I. Gadient; J. L. Holleran; Ralph C. Hook; John Y. Inagaki; H. K. B. Keppeler; Rex S. Kuwasaki; Eugene W. I. Lau; Edmond H. Leavey; Jack H. McDonald; Estate of Jack D. Merriman; Administrator; Joe Jack Merriman; Glenn K. Mowry; L. M. Neves; James J. Peveler; William H. Pruyn; Edison C. Robinson; Dallas Rowley; John L. Smart; Edward D. Sultan, Jr.; James H. Tabor; Nicholas Wallner; Peat, Marwick, Mitchell & Co., Coopers & Lybrand, and Deloitte, Haskins & Sells; and Does 1–50, Defendants.

Civil No. 79–0037, also known as Bankruptcy No. 76–0512(29).

United States District Court, D. Hawaii.

July 23, 1980.

R. Charles Bocken, Damon, Key, Char & Bocken, Honolulu, Hawaii, Loren R. Rothschild, Fogel, Julber, Reinhardt, Rothschild & Feldman, Los Angeles, Cal., for plaintiff.

Robert Griffith, Honolulu, Hawaii, for Claire DeVault.

Peter A. Lee, Honolulu, Hawaii, Roger Hurwitz, Kansas City, Mo., for Estate of Jack D. Merriman, Joe Jack Merriman, William C. Erickson and Edison C. Robinson.

Michael D. Hong, Honolulu, Hawaii, for John Y. Inagaki.

James Peveler, pro se.

George L. T. Kerr, Chun, Kerr & Dodd, Honolulu, Hawaii, G. Richard Doty, McCuthen, Black, Verleger & Shea, Los Angeles, Cal., for Peat, Marwick, Mitchell & Co.

Edward A. Jaffe, Cades, Schutte, Fleming & Wright, Honolulu, Hawaii, for Coopers & Lybrand.

Paul Lynch, Case, Kay & Lynch, Honolulu, Hawaii, Alfred I. Rothman, Loeb & Loeb, Los Angeles, Cal., for Deloitte, Haskins & Sells.

## DECISION ON DEFENDANTS' MOTION FOR RECUSAL

MARTIN PENCE, Senior District Judge.

On March 28, 1978 the Trustee, John T. Goss, applied to this judge, who, because of the disqualification of bankruptcy Judge John Chinen, Chief Judge King, and Judge Wong, was then handling all matters involved in the Chapter X proceedings, for authorization to prosecute this present action. In his application, the Trustee set forth that he had "substantially completed an investigation into the areas pertaining to fraud, misconduct, mismanagement, and irregularities" involving the former officers and directors and accountants of the bankrupt. The Trustee set forth that special counsel and special CPAs retained by the estate for matters relating to the investigation had advised Trustee that they believed

"that the estate has meritorious claims against" the three defendant accounting firms involving possibly "several million dollars" in direct and consequential damages. The Trustee then stated that he had "determined, in the interest of the estate, that a law suit should be filed to recover the damages on behalf of the estate." The Trustee also stated that the costs of litigation might be approximately $500,000 and that he recognized that "in this case, as in all litigation, there is an element of risk that the case will be decided adversely to the Trustee." Although Chapter X, Rule 10–610 provides that the Trustee may, with or without court approval, prosecute any action on behalf of the estate, since Supervisory Committees' Note to Rule 10–610 states that it is nevertheless "quite appropriate and desirable for a trustee to obtain prior court approval before instituting actions on behalf of the estate, particularly actions resulting from the trustee's investigation . . .," all that was sought was that the court, after considering the representations, "approve the trustee's intended course of conduct." The Trustee then stated that he believed "that this application should be a sealed pleading . . . so as to reduce the prejudice to the estate which might develop if the matters set forth in this application or at the hearing were made a matter of public record generally". This judge thereafter authorized the Trustee to prosecute the action, and sealed the pleadings. The seal was lifted on June 4, 1980.

The instant complaint was filed December 15, 1978, and the case was then placed on Judge King's calendar but it was almost immediately assigned to the calendar of Senior Judge A. Sherman Christensen of the District of Utah, who was handling a companion complaint filed by THC Financial Corp. (THCF) against many of the same defendants in the instant case. Nevertheless, the initial hearings on motions and stipulations were heard by Judge King although from time to time this judge also approved stipulations. It was not until March 1979 that Judge King signed the order reassigning this case from Judge Christensen to this judge, the THCF case having been settled. Thereafter, most of the hearings on motions, etc., were heard by this judge, even though on August 7, 1979 it was Judge Pregerson of the Central District of California who designated the case as one for complex litigation and approved Pretrial Order No. 1B. (This judge had approved Pretrial Order No. 1A.) Thereafter, except for occasional approval of stipulations, all the proceedings in this case have been handled by this judge.

This judge ruled on motions to dismiss counterclaims, motions compelling inspection of documents, motion for voluntary dismissals of certain defendants, pretrial orders, motions for reconsideration of orders, and handled a multitude of other stipulations and orders prior to the filing of the instant motion for recusal on May 15, 1980, all without any indication from any party that they might have any question as to this judge's impartiality.

It was not until over three months after the Court of Appeals for the Ninth Circuit had, on January 2, 1980, handed down its opinion in *In re Pacific Homes*, 611 F.2d 1253 (9th Cir. 1980) that counsel for the defendants filed the instant motion claiming that the impartiality of this judge "might reasonably be questioned" because (1) this judge was supervising the Chapter X proceedings involving The Hawaii Corporation, Debtor; (2) this judge "is required to have close and frequent contact with John T. Goss, Trustee of the Estate of The Hawaii Corporation, and with his counsel"; (3) "of necessity, many of such contacts between Judge Pence and the Trustee and his counsel are private, in chambers, and *in camera*"; (4) this judge "approved the employment by the Trustee of special counsel to investigate the performance by the Accountants of services for the debtor and its subsidiaries and approved the payment of substantial fees to such special counsel for services in that connection"; (5) this judge "approved the engagement of Ernst & Whinney to review the work of the Accountants and to advise said special counsel for the Trustee and approved the payment

**344**

of substantial fees for services in that connection"; (6) this judge "authorized the commencement of this action and the continued employment of special counsel by the Trustee for the purpose of prosecuting this litigation against the Accountants and has authorized the payment of substantial fees to said special counsel for such services. The Application for such authorization and the order thereon are sealed and are not available for examination by the Accountants or others"; (7) "fees of special counsel for the Trustee in this litigation have been paid, and it is anticipated that they will continue to accrue and be paid in the future, at the rate of nearly $20,000 per month"; (8) "such substantial expenditures of money for fees of special counsel and expert advisers could be advantageous to the estate of the Debtor only if the litigation is expected to produce a recovery for the estate substantially in excess of the moneys expended by the estate in pursuing the litigation; and by hindsight such substantial expenditures will have been justified only if the Trustee succeeds in effecting a recovery by reason of this litigation which substantially exceeds such expenditures"; (9) "it seems self-evident that, in the common perception, a judge might be thought to desire that his judgment in approving such expenditures by the estate, in the expectation that they would prove to be beneficial to the estate, would prove to have been correct"; and (10) "in such circumstances, the impartiality of the judge who had approved the expenditures, when sitting as judge in the case for the prosecution of which the expenditures had been made, might reasonably be questioned, particularly when the proceedings respecting such approval are sealed."

As frankly stated by movants, this suggestion and alternative motion (for recusal) were "prompted by"[1] dicta in *In re Pacific Homes.* In that case:

[T]he sole issue is whether, under the Bankruptcy Act of 1938, a bankruptcy judge in a Chapter X bankruptcy proceeding has jurisdiction to hear a plenary action for negligence, breach of fiduciary duties, mismanagement, and waste brought by a Chapter X trustee where the defendants . . . filed a timely objection to the jurisdiction of the bankruptcy referee.

The district court held that the bankruptcy judge had jurisdiction . . . despite the appellant's objection, and this appeal is from its order denying a motion to withdraw reference of the case . . . . The complaint seeks damages in excess of fifty million dollars . . . . It is beyond dispute that under the Bankruptcy Act of 1938, the bankruptcy judge may not hear a plenary action in a straight bankruptcy proceeding without the consent of the defendants . . . . [citing cases] The district court held that this rule does not apply to Chapter X proceedings. . . .

*In re Pacific Homes*, pp. 1254–5.

The Appellate Court, after citing *Weidhorn v. Levy*, 253 U.S. 268, 40 S.Ct. 534, 64 L.Ed. 898 (1920) and contrasting the old Act with the Bankruptcy Reform Act of 1978 (which gives the bankruptcy judge power to hear a plenary action even though defendant objects (28 U.S.C. § 1471, *et seq.*) lessens the bankruptcy judge's involvement with the reorganization and the appointment of the trustee, and provides for more rigorous appellate procedure (28 U.S.C. § 151 *et seq.* and 581 *et seq.*) held that plenary actions brought by the trustee in a reorganization proceeding under the old Act must be heard by a district Judge.

After reaching the above conclusion and justifying the same, the court then stated:

A further important policy consideration supports our conclusion. Before the Bankruptcy Reform Act of 1978, the bankruptcy judge was intimately involved with the administrative steps in reorganization of the bankruptcy estate. *See* 1 Collier on Bankruptcy ¶ 6.01 (15th ed. 1979). The nature of the bankruptcy judge's administrative duties under that statute encouraged ex parte contact with the trustee and created the opportunity

---

1. Movants' Memorandum of Points and Authorities, p. 1, 1.3.

for gaining independent factual knowledge of the suit. Furthermore, the bankruptcy judges frequently appointed the trustees who appeared as litigants before them. These factors might have created the appearance of prejudice in favor of the estate, if not actual prejudice.

The court, after noting the differences between the old Bankruptcy Act and the Bankruptcy Reform Act of 1978, stated that those differences "support our holding that the plenary jurisdiction of the bankruptcy judge is more limited under [the old Act]." We hold that, under the previous law, plenary actions brought by the trustee in a reorganization proceeding must be heard by a district judge unless the defendants consent to the jurisdiction of the bankruptcy judge.

From the above quotations, it is to be noted that even a bankruptcy referee[2] under the old Act (which is the one under which the plaintiff's present Chapter X proceeding is being processed) with the consent of a defendant may try a plenary action brought by the trustee in a reorganization proceeding even though, under the above-quoted dicta his involvement in the bankruptcy proceedings "might have created the appearance of prejudice in favor of the estate, if not actual prejudice".

In the instant case, Hawaii's one bankruptcy referee found himself disqualified to handle the Chapter X proceeding involving The Hawaii Corporation (THC). In its companion case involving a wholly owned subsidiary of the instant plaintiff—in re THC Financial Corp. (THCF), Hawaii's two district judges, Chief Judge King and Judge Wong, subsequently found themselves disqualified. This district judge, perforce, undertook to carry out the statutory bankruptcy proceedings of both the THC and THCF corporations.

Prior to In re Pacific Homes, over the preceding 18 years this judge had presided over a multitude of bankruptcy cases when Hawaii's single referee was unable to serve. This judge has appointed trustees and receivers, has approved the hiring of counsel, payment of trustees, payment of counsel, approved reorganization plans—has handled all of the problems normally handled by referees in bankruptcy cases. Throughout those bankruptcies, this court has tried many plenary actions spawned therefrom, in which trustees and receivers were involved as either plaintiffs or defendants, without any attorney ever filing any motion for recusal or even verbally stating or inferring that this judge's conduct of the bankruptcy proceedings had "created the appearance of prejudice in favor of the estate, if not actual prejudice".

As soon as astute counsel discovered In re Pacific Homes, however, immediately on February 27, 1980 there was filed a Motion for Recusal, based upon its dicta, in Osborne and Bancorp Hawaii, Inc. v. Artec Construction and Hawaiian Trust Co., Ltd., # 76–0512(32) and # 76–0493(50). This judge granted that Motion for Recusal solely because he had authorized the trustee to enter into the very contract, the enforcement of the terms of which were under litigation. None of the contentions of either the plaintiffs or defendants in Artec involved any criticism or attack upon any act or representation of the trustee in connection with the contract. All were primarily aimed at the representations of plaintiff seller to the defendant buyer. THCF's reorganization plan would only minimally be affected by the outcome of the suit. Nevertheless, smeared by the broad brush of In re Pacific Homes, this court then felt compelled to grant the motion of recusal in that case.[3]

The instant motion for recusal demands a deeper evaluation of the acts of this judge sitting in bankruptcy, as well as the authorities cited by the defendant in support of its motion.

---

2. In In re Pacific Homes the Appellate Court uses the term "bankruptcy judge" and "referee" interchangeably. For clarity sake, in this opinion the term "referee" is used exclusively.

3. This court did not make the same examination in depth of the recusal problem in Artec, prior to decision, that was made in this case. In hindsight, it would appear that this court's recusal may have been in error.

In analyzing *In re Pacific Homes*, it appears that the basis for the appellate court's conclusions concerning the frequent appointments, by the referee, of the same persons to act as trustees, the intimacy of the referee with the trustees and their attorneys, and the opportunity for the trustee "for gaining independent, factual knowledge" of litigation of the bankrupt estate is, as cited therein, 1 Collier on Bankruptcy, § 6.01 (15th edition 1979). That reference sets forth Collier's interpretations of the Hearings of the Subcommission on Civil and Constitutional Rights of the House Commission on the Judiciary, 94th Congress, First and Second Sessions (1976), and the Commission Report of the Commission on the Bankruptcy Laws of the United States, HR Doc. No. 137, 93rd Congress, as well as the House of Representatives' Report No. 595 of the 95th Congress (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

In Collier's is quoted the statement of Harold Marsh, Chairman of the Commission:

As the result of the nature of the system itself, there exists a relationship between the bankruptcy judges, the trustees and the counsel for the trustees which many people, including many involved in the system, consider unhealthy from the point of view of proper judicial and governmental administration. The judges by and large appoint the trustees and thereby in effect select the counsel . . . .
These same trustees and lawyers then deal on a day to day basis with the judge regarding the routine conduct of the proceeding, and finally these same trustees and lawyers appear before the judge as litigants and counsel when a controversy arises.

Collier continues:

The frequent contact between the bankruptcy judge and his appointee, not in itself improper, and in fact often necessary, followed by the trustee appearing as a litigant before the same judge justifiably gave rise to suspicion that the bankruptcy judge cannot be an impartial arbitor.

Collier then goes on without any *factual* basis to equate "suspicion" with a conclusive "appearance of impropriety". Collier thereafter states:

Under the Act the bankruptcy judge acts in dual roles. The administrative, supervisory and clerical functions in bankruptcy cases are the responsibility of the bankruptcy judges in addition to their judicial duties. This situation is in marked contrast to most litigation, in which the parties themselves manage the progress of the case. The judge does not become involved and if a party fails to take action, the judge does not intercede on his behalf.

The above quotation indicates that Congress, during its hearings on the new Bankruptcy Act, was not made aware of the fact that almost all district judges, today, take steps to make sure that the progress of litigated cases is *not* left to "the parties themselves [to] manage the progress of the case." Congress was apparently unaware of the way in which district judges use the procedures set forth in the Manual for Complex Litigation. In almost all litigated cases the district judges of today actively control and direct the management of the progress of the cases before them.

Further on, we find Collier saying:

[B]ecause of the significant potential for fraud, self-dealing, and diversion of funds [in bankruptcy] . . . [t]his requires active supervision of bankruptcy cases. Too many people are affected to allow a bankruptcy case to proceed untended by an impartial supervision.

It is to be noted that Collier, without any factual foundation therefor, other than citing the House Report, then concludes that the supervision of any judge sitting in bankruptcy cannot and does not give "impartial supervision" to the proceedings.

Again, on pages 6–21 we find Collier taking the same conclusory approach without specific facts to sustain the conclusion:

As administrator of a case and responsible for supervision of the trustee or debtor in possession is it not impossible for the bankruptcy judge to feel personally

responsible for the success or failure of a case and to view the case as "my case." This attitude, of course, increases the likelihood of unfair decisions.

Collier is saying because it is "not impossible" for a referee to feel personally that a bankruptcy is "my own personal case and responsibility", ergo in every case each judge has this attitude and this, "of course increases the likelihood of unfair decisions." Judicial impartiality is thus assumed simply because it is "not impossible" for some referees to become personally involved in the outcome of a bankruptcy.

Collier continues:

> The problem is magnified in reorganization cases under Chapter X where the judge appoints the trustee and then *may* work with him in the conduct of the business. The appearance of unfairness is generated when the trustee appears before that same judge at a hearing. In a Chapter XI or XII case, where a receiver or the trustee may be appointed, the same situation *may* prevail. If the debtor is left in possession, the judge usually works closely with the debtor in possession in the management of the business. It is in these cases, where the judge *may* feel a personal responsibility for the success or failure, that the appearance of bias in the consideration of cases *may* arise. [Emphasis added]

Again, Collier creates an absolute out of what is a hypothetical possibility.

The Reports cited by Collier as authority for its conclusions constituted part of the justification for the radical changes brought about by the 1978 Bankruptcy Act. It may be judicially noticed that those changes were the result of a very strong and effective lobbying effort on the part of referees, who, not unreasonably, desired to have both their status and pay greatly raised, as well as attorneys of the "bankruptcy bar", who, also not unreasonably, wished to be freed from the fetters on their billings imposed by the Appellate Courts, e. g., the Ninth Circuit in *In re York International Building, Inc.*, 527 F.2d 1061 (9th Cir. 1975), and *In re Beverly Crest Convalescent Hospital, Inc.*, 548 F.2d 817 (9th Cir. 1976). The verity and validity of the facts from which came the conclusions reported in the Congressional Reports, above noted, are, to say the least, suspect.

Any appellate judge not personally familiar with the operation of bankruptcy referees and the way in which bankruptcies are handled, and without analyzing the source of its authority, not unnaturally, would accept Collier's generalities and conclusions as factually correct, and thereafter judicially repeat Collier's conclusion, just as did the Court of Appeals in *In re Pacific Homes.*

Irrespective of the picture of the bankruptcy referees, trustees, and attorneys presented to Congress and followed by Collier, it must not be overlooked that the Court of Appeals, in *In re Pacific Homes*, was simply attempting to justify its basis for concluding that a referee could not try a plenary action arising out of a Chapter X proceeding.

▇ It must also not be overlooked that in a Motion to Recuse a factual basis for the "appearance of impropriety" on the part of the judge whose recusal is sought must be stated with specificity. The Collier-type approach, which may suffice well for the purpose of amending and changing legislation, cannot suffice to bring out the recusal of a trial judge.

▇ It is necessary then to turn to the facts as alleged in the motion to determine if those facts on their face demand, per se, a recusal by the district judge in this case, or if the question of recusal should be turned over to another judge for determination.

It is to be noted that the *factual* Allegations 1, 2, and 3, above, are that Judge Pence is supervising the Chapter X proceedings involving THC, debtor; that as part of his duties thereunder he has frequent contacts with Trustee Goss and his counsel; that of necessity there are contacts between Judge Pence and the trustee in chambers and *in camera*. Accompanying those factual Allegations, however, in number 2 there is the allegation that "Judge Pence is re-

quired to have close . . . contact with Goss . . . , and with his counsel." No facts are alleged to define or support the use of the conclusory word "close". Movants have set forth no facts to indicate that this judge has had any other than proper, legal, unimpeachable contacts, on the record, with Goss and his counsel.

In Allegation number 3 there are no facts alleged to support the conclusion that it is necessary for this judge to have many private contacts with the trustee and his counsel. Defendants allege no facts showing that there have been any "private" contacts. Hearings in chambers and hearings *in camera* are alleged but those facts do but simply state a course of conduct which every district judge may properly follow in handling *any* judicial matter before him.

Allegations number 4, 5, and 6 are that this judge approved the employment by the trustee of special counsel to investigate the performance by the accountants and approved the payment of substantial fees to counsel; that this judge approved the engagement of an accounting firm to review the work of the defendants and advised trustee's special counsel thereon and thereafter approved the payment of fees for services rendered, and that this judge authorized the trustee to commence the present suit and continue the employment of special counsel to prosecute the litigations against the defendants and authorized payment of substantial fees to such counsel. The allegations are that the application for such authorization and the court's order "are sealed and not available for examination by defendants".

In order to protect the creditors from possible spendthrift actions on the part of the trustee, the bankruptcy law mandates that the trustee shall show to the court that the objectives for which he wishes to spend money are not unreasonable and that the fees and costs therefor are not unreasonable. There is no allegation that any such supervision or "approval" carries with it anything but an impersonal obligation on the part of the judge to determine whether the trustee's request and recommendations are reasonable or not.

There is no allegation, nor can there be, that this judge appointed Goss as trustee because of any possible friendship, or that this judge is a personal friend of the trustee's attorney, or that this judge selected the attorney for trustee Goss.

The application for the authorization was unsealed and available for examination by the defendants after the instant motion for recusal was filed. The application itself sets forth the justification for the temporary sealing.

Sealed pleadings and sealed orders are common judicial fare. There are a multitude of reasons for sealed pleadings and sealed orders, e. g., confidentiality, prevention of public scandal, prevention of warning to defendants of impending litigation, etc. Nothing in the issuance of such orders by the court permits the slightest inference of impropriety on the part of either the judge or counsel.

The 7th Allegation is simply that this judge will have to pass upon the time sheets for special counsel for their services on behalf of the trustee in the manner demanded by the Ninth Circuit in *York International Building, Inc.*, and *Beverly Crest, supra.* There is no allegation that this judge has any personal involvement in carrying out such ordinary routine judicial actions.

Allegation number 8 is that the substantial expenditure of monies for fees of special counsel and experts would benefit the estate only if the trustee expected to win the litigation and recover a judgment for more than he spent in pursuing the litigation. Such expectation is the basis for almost every lawsuit in which the plaintiff seeks a money recovery damage from the defendants. As indicated above, however, trustee advised the court of the circumstances under which he undertook the present litigation and indicated a full awareness of the risk of losing any litigation. There is no allegation that this judge is personally concerned with the outcome of this litigation. According to the public record on file in the THC bankruptcy case, the plaintiff's assets now total some $6,000,000.

There is no allegation that the cost of this litigation will "re-bankrupt" the debtor estate. There is not even an allegation that the success of any reorganizational plan of the trustee can only succeed if this litigation is successful. (The application for consideration of the bankrupt's reorganizational plan was filed July 8, 1980. That plan called for orderly liquidation.)

There is nothing in the bankruptcy law that demands that the trustee can justify bringing a lawsuit only if he wins. Nevertheless, in Allegation number 9, without any factual basis therefor, and, only paraphrasing the dicta in *In re Pacific Homes,* defendants allege that "it seems self-evident that, in the common perception, a judge might be thought to desire that his judgment in approving such expenditures by the estate in the [judge's] expectation" the trustee would win, "would prove to have been correct". Nowhere is there any fact alleged to show that this judge approved the trustee's application for leave to spend money in prosecution of the suit because the *judge* expected that the trustee would win, and that the judge would in any wise be influenced to rule in favor of the trustee in order to prove that he was right in authorizing the expenditures. No such fact exists. Defendants can point to no public or private utterances to sustain their conclusory statement regarding the judge's state of mind. Without showing any facts or data to sustain the same, defendants conclude that "there is a common perception" as to what the thought processes and desires of a judge "might be" and that a judge would rule in favor of the estate solely because he had not denied the trustee an opportunity to proceed with a course of action that the trustee's attorneys had advised him he should take, and with which advice the trustee concurred.

The whole concept of the conclusory statements contained in Allegation 9 arises out of the dicta in *In re Pacific Homes,* which arose out of Collier's conclusory statements, which arose out of the Congressional Reports, which arose out of the lobbying efforts of referees and members of the bankruptcy bar as above set forth.

Allegation 10 does but reiterate that because the judge approved expenditures of estate funds for the purpose of prosecuting a run-of-the-mill civil action, then if he thereafter were to sit as judge in that civil action his impartiality automatically "might reasonably be questioned".

It is to be noted that the conclusion of the Appellate Court in *In re Pacific Homes* was not based upon such shallow reasoning. As indicated above, the Appellate Court relied upon Collier's conclusions and Collier's restatement that the referees were "buddy-buddies", i. e., intimate friends, with the trustees and bankruptcy attorneys, with appointments in each capacity arising from such intimate friendships. The Appellate Court, via Collier, also concluded that this intimate involvement encouraged ex parte contact between the judge and the trustee and "created the opportunity for gaining independent factual knowledge of the suit". It was from the above conclusions that the final assumption was made by the Appellate Court: "*These factors* might have created the appearance of prejudice in favor of the estate, if not actual prejudice." [Emphasis added.] Nowhere are there any allegations that this judge was a party to any of the factors which brought about the conclusion of the Appellate Court in *In re Pacific Homes.* As indicated above, there was no factual allegation of any intimacy between this judge, the trustee, and the trustee's attorney or that ex parte conduct of the type condemned in the Congressional Reports was involved, or that from ex parte conduct this judge had any "opportunity for gaining independent factual knowledge of the suit". The facts of the instant case do not fit into the soft wax mold of *In re Pacific Homes.*

*Citation of Authorities*

Movant correctly stated that authorities directly in point are limited.[4] *American*

---

4. Page 3 of Memorandum of Points and Authorities in Opposition to Suggestion of and Motion for Recusal.

*Employers' Insurance Company v. King Resources*, 545 F.2d 1265 (10th Cir. 1976) was concerned with a motion to consolidate some nine cases before one judge. The motion was denied because "the fiduciaries and all parties of interest in these cases . . . have some conflicts of interest . . . that any judge assigned to hear them *in their totality* would be so caught up in those conflicts as to subject his determinations to the appearance of a lack of impartiality." Moreover, the preservation of the King Resources Company was to some extent dependent upon the outcome of one of the nine interrelated cases. On its facts, therefore, it is inapposite to the situation here.

Somewhat similarly in *United Family Life Insurance Company v. Barrow*, 452 F.2d 997 (10th Cir. 1971) Judge Barrow, who was supervising the Chapter XI proceedings, was disqualified from sitting as judge in litigation involving the proceeds of a large life insurance policy when it was demonstrated that he was a long-time personal friend of the very prominent debtor family and their attorney, the former Governor of Oklahoma, and he had given his approval to a plan of reorganization which could succeed *only* if the trustee were successful in collecting on the insurance policy. None of those factors are present in this case. Neither *In re Penn Central Securities Litigation*, 322 F.Supp. 1021 (Jud.Pan.Mult. Lit. 1971), nor *In re Four Seasons Securities Laws Litigation*, 328 F.Supp. 221 (Jud.Pan. Mult.Lit. 1975) nor *In re Com. Oil/Tesoro Petro. Sec. Litigation*, 458 F.Supp. 225 (Jud. Pan.Mult.Lit. 1978), nor *Stirling Homex Corporation*, 388 F.Supp. 567 (Jud.Pan.Mult. Lit. 1975) and 388 F.Supp. 572 (Jud.Pan. Mult.Lit. 1975), are factually analogous to or even inferentially controlling upon this case in its present posture. There is no such potential conflict in this case as was envisaged in the four above cases.

*Rapp v. Van Dusen*, 350 F.2d 806 (3d Cir. 1965), likewise involved facts not in any way resembling the situation here and is thus completely inapposite. The same can be said of *United States v. Ritter*, 540 F.2d 459 (10th Cir.), *cert. den. sub nom. Olson*

*Farms, Inc. v. United States*, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976), and *In re Continental Vending Mach. Corp.*, 543 F.2d 986 (2d Cir. 1976).

*Rosen v. Dick*, 83 F.R.D. 540 (S.D.N.Y. 1979) and *Carpenter v. Hall*, 352 F.Supp. 806 (S.D.Tex.1972), cited by the plaintiffs, are almost squarely in point. In *Rosen v. Dick*, Judge Metzner of the Southern District of New York faced a similar motion for recusal presenting the present question, viz., whether a district court judge sitting as a bankruptcy judge should preside over a plenary suit in the district court. Judge Metzner said:

> The responsibility of a judge is to see that justice is done in matters brought before him for disposition. Conceptually, the discharge of this responsibility cannot create a conflict of interest under the circumstances. The claim that the court would favor the trustee whom it appointed over the defendant in a plenary suit is ludicrous. The appointment was a judicial act mandated by statute. Creditors receive no greater solicitude from the court in pursuing their rights than defendants against whom they proceed. The conflicting issues are determined on their merits . . . the court's impartiality cannot be reasonably questioned in this case just because it is also the bankruptcy judge.

District Judge Metzner reached a similar conclusion to that of District Judge Hannay in *Carpenter v. Hall*, 352 F.Supp. 806 (S.D. Tex.1972) where, in an action brought by the reorganization trustee against a national bank, certain of its officers and others, defendants moved that the case be reassigned to another judge because of the claimed potential conflict between the court's responsibilities as reorganization judge and as plenary judge. Judge Hannay said:

> [M]ovant's position . . . is that a federal judge who either has or has had reorganization responsibilities is, as a matter of law, thence forward disqualified from presiding over any other matter

collateral to that proceeding on the subject matter there involved if he might be called upon to make a ruling that might in any manner adversely affect the debtor then in reorganization . . . This court does not understand this to be the law.

. . . . .

[F]or the Judge of this Court to now step aside on the basis of the tardy technical disqualification now urged and transfer this massive proceeding to another judge would be a disservice to the litigants, the attorneys and the other overburdened judges of this district of such a magnitude as to be unthinkable.

The decisions in *Rosen* and *Carpenter* distinguished the cases cited by the movants, above.

 Apart from the preceding analysis of the insufficiency of defendants' allegations and the inapplicability of the cases cited, the whole concept that a district judge, who performs the duties of a bankruptcy judge in the normal manner set forth under the old Bankruptcy Act should thereafter be disqualified from sitting as a district judge in a plenary proceeding in which the trustee for the bankrupt estate was in any manner involved, runs afoul of the well-settled law on the matter of recusal laid down by the court in *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1967), which states clearly that any alleged biases and prejudices must stem from some extrajudicial source and result in an opinion on the merits on some basis other than what the judge has learned from his participation in the case. As stated in the "cautionary note" included in the legislative history of the 1974 amendments to 28 U.S.C. Section 455:

Disqualification for lack of impartiality must have a reasonable basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not to face a judge where there is a reasonable question of impar-

tiality, but they are not entitled to judges of their own choice." H.R. Rep. No. 93–1453, House Judiciary Committee, 93 Cong.2d Sess., 1974 U.S.Cong. & Admin. News, pp. 6351, 6355. [Citations omitted.]

As was said in *Botts v. United States*, 413 F.2d 41 (9th Cir. 1969), the requisite affidavit showing reasonable factual basis for doubting the judge's impartiality "cannot be founded upon a judge's findings of fact and expression of judicial opinion arising out of the very case in which the disqualification is sought." While in one sense the instant civil action is not the same as the bankruptcy action, nevertheless counsel have made the latter but a part of the former in tying the two together in the instant motion.

The litigation of the instant type is very time-consuming both for the parties and the judge. It involves nothing of great social or political or even judicial interest. The legal problems involved have not been and will not be particularly new or particularly intellectually stimulating. This judge has no "desire" to continue with the case. There is no longer under 28 U.S.C. § 455(a) any "duty to sit" but, as the House Report says, "the new test should not be used by judges to avoid sitting on difficult or controversial cases".

28 U.S.C. § 144 setting forth the procedural requirements to be followed in a disqualification proceeding mandates that "the affidavit shall state the facts and reasons for the belief that bias and prejudice exist. To be sufficient, the specific facts and reasons must be laid out; conclusory allegations and speculations are not sufficient." *Action Realty Co. v. Will*, 427 F.2d 843 (7th Cir. 1970). Throughout the whole spectrum of requirements for disqualification of a judge is the insistence that there must be a *factually reasonable* basis for the same. As the above analysis in depth of defendants' motion indicates, movants have set forth no facts to support their conclusions. Even their conclusions do not contain the factors nor do they fit into the pattern premised by *In re Pacific Homes*. For all of the reasons,

**352**

both legal and factual, set forth above, the Motion for Recusal is DENIED.

As the preceding analysis demonstrates, the question of recusal need not be turned over to another judge for determination.[5]

5. *See United States v. Azhocar*, 581 F.2d 735, 738 (9th Cir. 1978), and *United States v. Olan-der*, 584 F.2d 876, 883 (9th Cir. 1978).