**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Daniel Joe CHISCHILLY,
Defendant–Appellant.**

**No. 92–10619.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 1, 1993.

Decided July 25, 1994.

Deborah Williams, Asst. Federal Public Defender, Phoenix, AZ, for defendant-appellant.

Stanley L. Patchell, Asst. U.S. Atty., Phoenix, AZ, for plaintiff-appellee.

Before: CHOY, CANBY, and NOONAN, Circuit Judges.

Opinion by Judge CHOY; Dissent by Judge NOONAN.

CHOY, Circuit Judge:

On July 2, 1992, appellant Daniel Chischilly ("Chischilly") was convicted by a jury in the United States District Court for the District of Arizona of aggravated sexual abuse and murder in violation of 18 U.S.C. §§ 1111, 1153 and 2241(b)(1). Chischilly appeals, challenging six aspects of the court's ruling and one aspect of sentencing, including (1) the judge's refusal to recuse himself on the basis of prior dealings with the defendant in state court proceedings; (2) the finding that Chischilly was competent to stand trial; (3) the finding that Chischilly consented to give a blood sample despite his prior request for an attorney; (4) the admission of testimony relating to Chischilly's DNA test results; (5) the finding of a sufficient nexus between vehicular assault and rape to support a felony murder charge; (6) the refusal to give requested jury instructions on involuntary manslaughter, a lesser included offense; and (7) the imposition of concurrent life sentences based on aggravating circumstances in the absence of a sufficient statement of reasons for an upward departure.

Having jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we affirm Chischilly's conviction but vacate the concurrent life sentence imposed on Count II, aggravated sexual abuse.

## BACKGROUND

Chischilly's conviction arises out of the rape and murder of Sheila Tso on the outskirts of Sanders, Arizona on January 1,

1990. Chischilly is a Navajo Indian living in a remote rural part of a Navajo reservation in Northern Arizona. Shortly after noon on New Year's Day, 1990, Chischilly appeared at the Sanders fire station. Visibly shaken, he informed a fireman that an accident had occurred on the reservation three miles away and that a woman was lying hurt beside Querino Canyon Road.

Chischilly directed the firemen and a team of paramedics to a portion of the road's shoulder showing fresh tire tracks. He then retraced 60 feet of drag marks to lead them to the victim. Ms. Tso was found in the shade of a roadside tree, lying spread-eagled and half-naked amidst patches of snow, her undergarments removed and shirt lifted up around her neck. The paramedics rushed the victim's cold and pulseless body to an emergency room. Upon arrival at the hospital, Ms. Tso was found to be already in full arrest and was pronounced dead. An autopsy revealed cerebral contusions, a fractured pelvis and backbone, and bruising on the back of the legs. The examining physician, Dr. McFeely, later testified that Ms. Tso's injuries indicated that she had been struck from behind by a vehicle with a great deal of force, lost consciousness immediately and eventually died of multiple injuries and hypothermia.

When an Arizona Highway Patrol officer arrived at the scene of the accident, Chischilly tried unsuccessfully to flee. He told the officer that, while on foot, he discovered drag marks leading to a woman lying half-naked on the ground but still breathing. Chischilly added that he then hitchhiked to the fire station to seek help. Chischilly initially repeated this account to officers who arrived subsequently, but then changed his account to state that he had been driving his pickup truck instead of walking. An officer described Chischilly as becoming increasingly nervous at this time and having a throbbing pulse in his neck.

Government witnesses later testified that Chischilly's truck matched the grill shards and tire tracks found at the scene of the accident. According to their testimony, fresh tire tracks on the dirt and gravel road indicated that the matching vehicle had headed south, past the eventual point of impact, made a U-turn off the east side of the road, veered over to the west side of the road and then stopped near the point of impact. The defense's accident reconstruction expert challenged this conclusion at trial.

At the scene of the accident, Navajo police arrested Chischilly on tribal charges, read him his *Miranda* rights and detained him in a police car. Several hours later, an Agent Burke of the Federal Bureau of Investigation (FBI) arrived and approached Chischilly. Agent Burke asked Chischilly whether he wanted a lawyer. When Chischilly answered in the affirmative, Agent Burke asked no further questions.

On January 9, 1990, eight days later, Agent Burke went to see Chischilly in the tribal jail. After Agent Burke advised him of his *Miranda* rights, Chischilly signed a waiver of these rights. Chischilly stated that from his previous arrests he was familiar with his *Miranda* rights, but said that he was nonetheless willing to speak with Agent Burke. Chischilly then offered that he had hit the victim with his truck after swerving to avoid an oncoming car. Chischilly also admitted that he had dragged her to a tree, taken off her clothes, had intercourse with her, wiped sperm from her vagina with a bra and left. At a pretrial hearing held on August 20, 1991, the district court suppressed this statement as having been obtained in violation of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

Agent Burke again went to see Chischilly in Window Rock on January 11, 1990, two days after his first jailhouse visit. Agent Burke again advised Chischilly of his *Miranda* rights. Chischilly responded that he remembered his rights and Agent Burke. Agent Burke then asked Chischilly if he would provide a blood sample. Chischilly stated that he would comply and that he knew the purpose of the blood sample. When Agent Burke questioned Chischilly on this point, Chischilly responded that the blood would be compared with evidence found at the scene. Agent Burke then explained a consent form to Chischilly item by item. Chischilly signed the form and was taken to the hospital to give the blood sam-

ple. The district court denied Chischilly's motion to suppress this evidence at a pretrial hearing held on August 20, 1991.

After his arraignment, Chischilly filed a motion for a competency determination. Judge Rosenblatt granted the motion and scheduled a hearing for February 7, 1991. While assembling his psychiatric records, Chischilly learned that in 1979 Judge Rosenblatt, then still an Arizona state court judge, had found Chischilly incompetent to stand trial on a four count sexual contact indictment. Following the 1979 competency hearing, Chischilly was released from custody without a conviction or further detention. Chischilly filed a motion requesting Judge Rosenblatt's recusal on the basis that the judge would be reluctant to again find him incompetent after learning that Chischilly had committed further crimes after being released without trial in 1979.[1] Judge Rosenblatt stated that he had no independent recollection of the 1979 competency proceedings and denied the motion for recusal.

At two pretrial competency hearings on February 7 and March 6, 1991, Chischilly offered the testimony of Dr. Otto Bendheim, a psychiatrist whose practice is described as focusing heavily on Native Americans, and Dr. Marc Walter, a neuropsychologist. The Government countered with the testimony of Dr. Alexander Don.

Dr. Walter administered two neuropsychological examinations of a combined duration of eight hours and interviewed members of Chischilly's family. From this data Dr. Walter concluded that the defendant had a verbal IQ of approximately 62 and the functional level of a five- or six-year old child. Dr. Walter testified that Chischilly could not meaningfully participate in legal proceedings and could not understand or be taught legal concepts. Dr. Walter further testified that Chischilly would be unable to assist his law-

yer effectively, notwithstanding his general understanding of the defense attorney's role.

Several months before trial, Dr. Bendheim initially diagnosed Chischilly as having organic brain syndrome and temporal lobe seizure disorder, resulting in deficient intellect, illiteracy and behavioral problems. Later developments made Dr. Bendheim's diagnosis more tentative. First, Chischilly showed modest improvement in response to psychotropic drug treatment. In addition, Dr. Don conducted tests indicating that Chischilly had some long-term retention of the events surrounding the victim's death.

Dr. Don agreed with Drs. Bendheim and Walter that Chischilly had behavioral problems, a structurally abnormal brain and deficient intelligence. However, Dr. Don did not agree that the defendant was mentally retarded. In view of Chischilly's improving memory, Dr. Don testified that Chischilly was "not so disabled by mental disorder, or defect, at this time, so as to be unable to understand the nature of proceedings against him and assist counsel in the preparation of his own defense." On March 6, 1991, the district court ruled that Chischilly was competent to stand trial. Chischilly abruptly walked out of the courtroom in the middle of the first day of trial. He then renewed his incompetency motion, which the district court again denied.

Following completion of the competency hearing, Chischilly learned from the Government that FBI tests had established a match between his blood sample and semen found on the victim's clothing. Chischilly filed a motion in limine and requested a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), to examine the admissibility of this identification evidence, never before presented in the District of Arizona, derived from DNA profiling analysis.[2] After an extensive hearing involving the testimony of eight scientists and the admission of 152

---

1. In 1981, Chischilly was convicted of property damage and verbal assault in New Mexico state court and sentenced to thirty days imprisonment. In 1982, Chischilly was convicted of attempted murder, assault and battery and sentenced to six years imprisonment.

2. For a reasonably clear, current and concise description of DNA identification profiling as conducted by FBI laboratories, see *United States v. Jakobetz*, 955 F.2d 786 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992) (taking judicial notice of the DNA identification analysis theories and procedures adopted by the FBI).

exhibits, the district court denied Chischilly's motion in limine.

At trial the jury heard further testimony from expert witnesses retained by each side on the FBI's findings, methodology and procedures and was presented findings from the recent report of the Committee on DNA Technology in Forensic Science of the National Research Council of the National Academy of Sciences (the "NRC Report"). According to the testimony of Government witnesses, DNA analysis conducted by the FBI later indicated a match between a sample of Chischilly's blood and sperm found on the victim. A Government expert witness, Dr. Chakraborty, further testified that one in 2563 would be a "conservative estimate" of the probability of a similar match between the DNA of a randomly selected American Indian and either the evidentiary sample or the defendant's DNA.

At the end of the Government's presentation of its case and again at the end of the defense's case, Chischilly filed a motion for judgment of acquittal. The district court denied both motions.

On July 2, 1992, the jury found Chischilly guilty on both counts. On September 28, 1992, he was sentenced to two life sentences, to be served concurrently.

## DISCUSSION

### I. Recusal

■ Chischilly contends that Judge Rosenblatt should have recused himself because, when still a state judge, he had held Chischilly incompetent to stand trial on unrelated sex charges in 1979. Chischilly speculates that Judge Rosenblatt would be cha-

grined to learn that Chischilly had committed later crimes, and would be prejudiced against finding him incompetent again. Judge Rosenblatt denied the motion, stating that "the Court has no independent recollection of the 1979 competency proceedings."

The Supreme Court has recently addressed the question of whether the personal bias or prejudice alleged in support of a motion for recusal under 28 U.S.C. § 455(a) must stem from an extrajudicial source.[3] The Court determined that judicial rulings may support a motion for recusal, but only "in the rarest circumstances" where they evidence the requisite degree of favoritism or antagonism. *Liteky v. United States,* —— U.S. ——, ——, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994). In addition, information and beliefs formed during current or prior proceedings may serve as the basis of a Section 455(a) motion, but only when "they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.*

Chischilly has shown no ground for disqualification but the bare fact of the prior ruling and conjecture as to its lingering prejudicial effect. *Liteky* instructs that "judicial rulings alone *almost never* constitute valid basis [sic] for a bias or partiality motion" and *per se* "cannot possibly show reliance upon an extrajudicial source" in a judge's deliberations. *Id.* (emphasis added); *see also, United States v. Hamilton,* 792 F.2d 837, 839 (9th Cir.1986) (affirming refusal to recuse where trial judge stated that he had no recollection of 15–year–old prior proceeding in which defendant had appeared before him and the record contained no evidence of bias or prejudice).[4] Accordingly, the trial judge did not

---

3. Section 455(a) provides that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).

4. In his dissent, Judge Noonan cites *Liteky,* —— U.S. at ——, 114 S.Ct. at 1157, for the proposition that Section 455 distinguishes between bias or prejudice originating from prior federal, as opposed to "extrajudicial" state court proceedings. We do not agree that logic or *Liteky* dictates this distinction. The Court's reference in *Liteky* to the imperfect demeanor we sometimes

display on the bench, "even after having been confirmed as *federal* judges," —— U.S. at ——, 114 S.Ct. at 1157 (emphasis added), is an isolated phrase incidental to its clarification of the "extrajudicial source factor." We do not think that this passing observation signifies a dichotomy between federal and state proceedings under Section 455, given the more explicit terms in which the Court draws other distinctions of comparable magnitude in the same paragraph (e.g., between mere temperamental remarks in matters of courtroom administration not implicating Section 455 versus those evidencing a deep-seated, extrajudicial animus precluding fair judgment).

abuse his discretion in refusing to recuse himself.

## II. Competency to Stand Trial

Chischilly asserts that his illiteracy and low level intelligence deprived him of the ability to understand factually the nature of the legal proceedings against him and to assist counsel with a reasonable degree of rational understanding. He contends that, lacking these capacities, he failed to meet the two criteria for competency to stand trial enunciated in *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

■ We review for clear error as a question of fact the district court's finding that the Government established the defendant's ability to stand trial by a preponderance of the evidence. *United States v. Hoskie*, 950 F.2d 1388, 1392 (9th Cir.1991). On defendant's appeal the evidence relating to his competency must be considered in the light most favorable to the Government. *United States v. Frank*, 956 F.2d 872, 874 (9th Cir. 1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 363, 121 L.Ed.2d 276 (1992).

■ Viewed in this light, the record reveals a rough balance of testimony militating against and in favor of Chischilly's competency to stand trial. At the competency hearing, Dr. Bendheim initially testified that Chischilly would be incompetent to stand trial. The district court reasonably discounted this testimony after Dr. Bendheim's subsequent diagnoses became increasingly uncertain as trial approached. Later examinations revealed improvements in Chischilly's recollection and attention span in response to treatment with psychotropic medication. By the time of the final competency hearing, one year after his initial examination of Chischilly, Dr. Bendheim acknowledged that he had changed his opinion of Chischilly's competency several times in view of these improvements and could not deliver a firm conclusion. As summarized by Judge Rosenblatt, at the final competency hearing Dr. Bendheim "quite frankly and honestly and openly testifies to the court that he simply does not know" whether Chischilly would be competent to stand trial. Accordingly, Dr.

Bendheim's later testimony neutralized his original, negative diagnosis.

The other expert called by Chischilly, Dr. Walter, offered more consistent but, viewed in the light most favorable to the Government, not especially compelling testimony as to Chischilly's incompetency to stand trial. Judge Rosenblatt discounted Dr. Walter's conclusion that Chischilly was unfit to stand trial on the not clearly unreasonable or erroneous basis that the doctor, a neuropsychologist, had offered medical conclusions straying beyond the realm of his training or expertise.

The Government's expert witness, Dr. Don, concurred with the defense experts' assessment that Chischilly had a faulty or at least selective memory, structural brain abnormalities and a history of behavioral problems. However, Dr. Don did not agree that Chischilly was mentally retarded, illiterate, brain damaged or incompetent to stand trial. Thus, the district court was presented with two contradictory diagnoses of Chischilly's competency and one tentative, variable assessment. To the extent that Judge Rosenblatt, from his courtroom observations, assigned more weight to the Government's expert than to the contrary, at times inconclusive conclusions of experts retained by Chischilly, he was acting within his discretion to do so as a part of his fact-finding and credibility-weighing functions. *See Frank*, 956 F.2d at 875 (noting that "a district court is free to assign greater weight to the findings of experts produced by the Government"); *United States v. Lindley*, 774 F.2d 993 (9th Cir.1985) (concluding that "the district court did not clearly err in assigning more weight to the findings of [the government's] psychiatrists"). Accordingly, we conclude that the district court did not clearly err in finding that Chischilly was fit to stand trial.

## III. Voluntariness of Confession and Consent to Give Blood Sample

■ Chischilly contends that the district court's ruling that his confession was voluntary kept him from presenting an insanity defense, because the ruling would have permitted the Government to use the confession in rebuttal. We conclude that Chischilly can raise this issue despite the fact that he did

not present his insanity defense and the Government accordingly did not use the confession against him. It is true that in *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), the Supreme Court held that a defendant who did not testify could not appeal the denial of an in limine motion that would have prevented the use of prior convictions for impeachment. *See also, Galindo v. Ylst,* 971 F.2d 1427, 1429 (9th Cir.1992) (same). *Luce,* however, recognized that its rule dealt with a preliminary ruling "not reaching constitutional dimensions." *Luce,* 469 U.S. at 43, 105 S.Ct. at 464. Because use of an involuntary confession would violate the Constitution, *Luce* does not apply. The Seventh Circuit so held in *United States ex rel. Adkins v. Greer,* 791 F.2d 590, 593–94 (7th Cir.1986). We agree with that decision, and therefore reach the merits of Chischilly's claim. *See also, Biller v. Lopes,* 834 F.2d 41, 43–45 (2d Cir.1987) (habeas petitioner can raise claim that denial of motion in limine unfairly kept him from testifying, when motion was based on unconstitutionality of prior conviction; *Luce* inapplicable).

### A. Voluntariness of statements

■ Chischilly contends that his mental impairment and susceptibility to intimidation by authority figures negated the voluntariness of his confession. This contention misconstrues the significance of the defendant's mental capacity in the absence of indicia of police coercion. Where the record lacks evidence of either physical or psychological coercion by law enforcement officials, the defendant's mental capacity is irrelevant to the due process inquiry into the voluntariness of the confession. *Derrick v. Peterson,* 924 F.2d 813, 818 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 161, 116 L.Ed.2d 126 (1991) (rejecting defendant's argument that his borderline mental retardation rendered his confession involuntary in the absence of proof of police overreaching), *citing Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986)

(holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment").[5] The district court's finding that Chischilly confessed voluntarily is therefore affirmed.

### B. The admissibility of the blood sample

■ The trial court ruled that Chischilly voluntarily consented to give a blood sample on the tenth day of his detention. The court admitted the sample into evidence as demonstrating a DNA match with semen found on the victim's clothing. Chischilly contends that because he did not consent voluntarily to give a blood sample, the Government could not rely on the consent exception to the warrant requirement for searches and seizures. Whether consent to a search was voluntary is a question of fact, subject to the clearly erroneous standard of review. *United States v. Alfonso,* 759 F.2d 728, 740 (9th Cir.1985). While the Government bears the burden of showing at trial that consent was given freely and voluntarily, on defendant's appeal the evidence must be viewed in the light most favorable to the Government. *Id.*

■ Because the evidence failed to demonstrate that Chischilly was incapable of giving consent or that his will was overborne, the district court's determination that Chischilly properly consented to the taking of the blood sample was not clearly erroneous. Even the only witness called by the defense to testify as to this issue, Dr. Walter, conceded that Agent Burke's account of taking a blood sample from Chischilly, if correct, indicated that Chischilly knowingly gave his consent. Viewed in the light most favorable to the Government, the record supports a finding that Agent Burke's account was accurate. The district court's admission of Chischilly's blood sample into evidence was therefore not clearly erroneous.

---

**5.** Although *Connelly* and *Peterson* arose under the due process clause of the Fourteenth Amendment whereas the instant case implicates the Fifth Amendment, *Connelly* is commonly extended to involuntary confession claims arising under

the Fifth Amendment. *See, e.g., United States v. Newman,* 889 F.2d 88 (6th Cir.1989), *cert. denied,* 495 U.S. 959, 110 S.Ct. 2566, 109 L.Ed.2d 748 (1990).

## IV. Admission of DNA Test Results

■ In view of the "raging controversy" in the scientific community over DNA testing, Chischilly contends that the district court committed reversible error by admitting evidence of a match between his blood sample and semen found on the victim's clothing, as well as testimony regarding the random probability of such a match. We review evidentiary rulings for abuse of discretion substantially prejudicing the defendant's rights. *United States v. Lee,* 846 F.2d 531, 536 (9th Cir.1988).

Compounding the obstacle this standard of review poses for Chischilly's fourth contention of error is the Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* — U.S. —, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)[6], handed down after the submission of the parties' initial briefs on appeal. In that opinion, the Court held that the Federal Rules of Evidence displaced the more arduous *Frye* test for the admissibility of novel scientific evidence in federal courts. Dispensing with the requirement that a novel scientific theory or technique enjoy general acceptance in the relevant scientific community to be admissible, the Court in *Daubert* held that Rule 702 is the "primary locus" of a trial judge's screening of purportedly scientific evidence for relevancy and reliability under Rule 104(a). *Id.* — U.S. at —, 113 S.Ct. at 2795. Rule 702 provides that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert "may testify thereto." The reference to "scientific knowledge" in Rule 702, the Court held, establishes a standard of evidentiary reliability requiring the proposed testimony to have been derived by the scientific method. *Id.* The Court established the following non-exclusive list of

factors to guide lower courts' assessment of the reliability of scientific evidence:

(1) whether a scientific theory or technique can be (and has been) tested.

(2) whether the theory or technique has been subjected to peer review and publication.

(3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation.

(4) whether the technique is generally accepted.

*Id.* — U.S. at — – —, 113 S.Ct. at 2796–97. The Court emphasized that this inquiry is "a flexible one" focusing on the principles and methodology underlying the proffered evidence rather than the conclusions they generate. *Id.* In addition, the Court underscored the supplemental role played by other Federal Rules of Evidence in the admissibility inquiry, including Rule 703's requirement that experts show reasonable, customary reliance on any otherwise inadmissible hearsay and Rule 403's weighing of possible prejudice versus probative value. *Id.* — U.S. at — – —, 113 S.Ct. at 2797–98.

Chischilly first challenged the reliability of the Government's DNA extraction and matching procedures on the following grounds: (1) the Government's experts were either drawn from the overly narrow field of forensic scientists, a group predisposed to accept new forensic techniques, or had a career interest in testifying on behalf of the FBI; (2) contaminants could have affected some of the samples relied on by the FBI in its DNA analysis and led to unreliable results; (3) inconsistencies in the gel used by the FBI in the electrophoresis process may affect the mobility of the alleles[7] in the DNA

---

**6.** The district court characterized the evidentiary hearing under both the *Frye* and Rule 702 designations.

**7.** An allele is "any alternative form of a gene that can occupy a particular chromosomal locus. In humans and other diploid organisms there are two alleles, one on each chromosome of a homologous pair." Dorland's Illustrated Medical Dictionary 48 (27th ed. 1988). Forensic DNA tests compare allele combinations at loci where the

alleles tend to be highly variable across individuals and ethnic groups. If there is no match between the alleles from the evidence DNA and the potential suspect's DNA, the suspect is generally ruled out as the source of the evidence, unless the failure is attributable to inadequate test conditions or contaminated samples. If there is a match, analysts use the frequency of the alleles' appearance in the relevant population to calculate the probability that another person could have the same pattern of allele pairs. *See*

fragments; (4) ethidium bromide, used by the FBI but not most research laboratories in gel electrophoresis, may retard the migration of DNA fragments through the electrophoretic gel; (5) the presence of additional bands on the autorads[8] interpreted in the RFLP[9] test may have indicated that the DNA samples were degraded; (6) the FBI's match criteria are subjective, imprecise, insufficiently stringent and not uniformly applied; and (7) the FBI's quality assurance program is inadequate and is subject to insufficient peer-reviewed publication.

Chischilly then questioned the FBI's statistical methods for determining the random probability of a match between his DNA sample and the relevant population and raised the following additional objections: (8) the product rule is a novel statistical procedure whose reliability is not generally accepted by the scientific community; (9) substructuring[10] within the Native American and Navajo populations invalidates use of the product rule to determine the probability of a coincidental match within the FBI's I-3 database for Native American populations; and

(10) the FBI's I-3 database is too small and contains too few Navajos.

■ Chischilly marshals an impressive body of academic commentary in support of several of his contentions and points out areas where the FBI's DNA testing and statistical procedures may warrant review and revision. Nonetheless, we conclude that under *Daubert* the district court did not abuse its discretion in admitting evidence of a DNA match and testimony regarding the probability of a coincidental match.

■ Challenging the motivations and impartiality of Government-retained expert witnesses, Chischilly's first objection is clearly conjectural and raises a credibility issue which the trial court was in a superior position to ours to weigh. In light of *Daubert,* Chischilly's second, third and fourth objections, regarding potential faults in the DNA sample extraction processes conducted in FBI laboratories, go to the weight to be accorded the evidence, not to its admissibility in the first instance. *See United States v. Martinez,* 3 F.3d 1191, 1198 (8th Cir.1993).

Georgia Sargeant, *DNA Evidence Finding Stricter Scrutiny, New Uses,* Trial, Apr. 1993, at 15.

8. An autorad (a.k.a. autoradiograph) is "a radiograph of an object or tissue made by recording the radiation emitted by radioactive material within it, especially after the purposeful introduction of radioactive material." Dorland's Illustrated Medical Dictionary 172. In DNA profiling, forensic scientists employ autorads in an extraction process known as "Southern Transfer", in which DNA fragments are placed atop a gel subjected to an electric current. DNA fragments comprised of alleles are then soaked up by capillary action into a nylon membrane. The membrane is then immersed in a solution containing a radioactive probe. These probes bind to portions of the DNA fragments containing complementary sequences of allelic base pairs (e.g., a radioactive probe with the sequence CCGGACAT would target a sample strand containing the nucleotide sequence GGCCTGTA). The membrane is then placed against a sheet of X-ray film known as an autorad. The radioactive molecules in the probe expose the autorad and leave traces known as "bands" indicating the location and distance travelled by the migrating alleles through the gel. A computer then scans the autorad and measures this distance, a variable corresponding to the size of a particular allele type (larger types of alleles tend to migrate

more slowly through the gel). Differences in band length at a given loci are analyzed to match or distinguish the alleles in the evidentiary DNA and the potential suspect's sample. For a fuller description of gel electrophoresis as applied to DNA forensic testing, see Lempert, *Some Caveats Concerning DNA as Criminal Identification Evidence: With Thanks to the Reverend Bayes,* 13 Cardozo L.Rev. 303, 304 n. 4 (1991) (hereinafter *"Caveats Concerning DNA"*).

9. RFLP (i.e., restriction fragment length polymorphism) analysis refers to the process of cutting the evidence DNA and the potential suspect's DNA into fragments at particular loci with "restriction enzymes". The resulting restriction fragments, comprised of "alleles" (i.e., one of two forms of a gene which may occur at any given gene locus; *see* n. 7 *supra* ), are subjected to gel electrophoresis, as described briefly at n. 8 *supra.*

10. "Substructuring" refers to the tendency toward decreasing genetic heterogeneity and allelic independence (*see* n. 7 *supra* ) exhibited by ethnically homogeneous, non-randomly mating populations; that is, a substructured population may be defined as one in which the probability of a random match between two of its members is greater than the likelihood of such a match between two members of the population at large.

■ The fifth objection, regarding the possible degrading of the DNA samples, is more troubling, insofar as it was based on data specific to Chischilly's DNA test and was not rebutted with especial force by experts retained by the Government. Nevertheless, Chischilly failed to demonstrate that the degradation is the result of a faulty methodology or theory as opposed to imperfect execution of laboratory techniques whose theoretical foundation is sufficiently accepted in the scientific community to pass muster under *Daubert*. *See Martinez*, 3 F.3d 1191, 1198 (8th Cir.1993) (finding under *Daubert's* flexible standard that "[a]n alleged error in the application of a reliable methodology should provide the basis for exclusion of the opinion only if that error negates the basis for the reliability of the principle itself").[11] The impact of imperfectly conducted laboratory procedures might therefore be approached more properly as an issue going not to the admissibility, but to the weight of the DNA profiling evidence.[12]

■ We reach the same conclusion with respect to Chischilly's sixth objection. Chischilly presented expert testimony that other laboratories, even one in which FBI protocols are used to prepare autorads, would have declared a nonmatch when comparing Chischilly's DNA sample with the evidentiary sample. With regard to admissibility, the mere existence of scientific institutions that would interpret data more conservatively scarcely indicates a "lack of general acceptance" under *Daubert's* fourth factor. Similarly, the testimony indicates disagreement over, not an absence of, controlling standards for purposes of the second part of *Daubert's* third factor, focussing on whether such standards exist and are maintained. *See United States v. Jakobetz*, 955 F.2d at 798–99.[13] Suggesting similar treatment of Chischilly's sixth objection, *Daubert* cautions lower courts not to confuse the role of judge and jury by forgetting that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof", rather than exclusion, "are the traditional and appropriate means of attacking shaky but admissible evidence." —— U.S. at ——, 113 S.Ct. at 2798.

■ In regard to the first part of *Daubert's* third factor, the known or potential rate of error, some commentators have objected that "the potential rate of error in the forensic DNA typing technique is unknown." *See, e.g.*, Hoeffel, *The Dark Side of DNA Profiling: Unreliable Scientific Evidence Meets the Criminal Defendant*, 42 Stan. L.Rev. 465, 509 (1990). However, we note that scientific institutions have undertaken on numerous occasions in recent years to estimate error rates attending DNA profiling. *See* Koehler, *DNA Matches and Statistics: Important Questions, Surprising Answers*, 76 Judicature 222, 229 (1993) (herein-

---

11. In *Martinez*, 3 F.3d at 1197, the Eighth Circuit took judicial notice of the FBI's current DNA testing protocol, theories and procedures and thereby reversed its previous rejection of DNA profiling evidence in *United States v. Two Bulls*, 918 F.2d 56 (8th Cir.1990), *vacated and dismissed as moot*, 925 F.2d 1127 (8th Cir.1991) (applying more stringent, pre-*Daubert* admissibility test). *See also, In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 858 (3d Cir.1990) (finding that an allegation of failure to apply a scientific principle properly should support exclusion of an expert opinion only if "a reliable methodology was so altered [by a particular expert] as to skew the methodology itself").

12. *See People v. Barney*, 8 Cal.App.4th 798, 813, 10 Cal.Rptr.2d 731 (1992) (finding that bandshifting does not affect the fundamental reliability of the FBI's DNA testing procedure, but only the admissibility or weight of the results in an individual case); *United States v. Jakobetz*, 955 F.2d 786, 800 (2d Cir.), *cert. denied*, —— U.S.

——, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992) (finding with regard to DNA profiling that "[t]he district court should focus on whether accepted protocol was adequately followed in a specific case, but the court, in exercising its discretion, should be mindful that this issue should go more to the weight than to the admissibility of the evidence"); Beeler & Wiebe, *DNA Identification and the Courts*, 63 Wash.L.Rev. 903, 938 (1988) (propounding that "each DNA test introduced as evidence must be administered properly, but challenges to proper administration go to the weight given to the evidence, not to the evidence's admissibility") (citations omitted).

13. A pre-*Daubert* case in a non-*Frye* jurisdiction, *Jakobetz*, like *Martinez*, took judicial notice of the FBI's current DNA profiling protocols and procedures under a test focusing on "whether the technique exhibits 'a level of reliability sufficient to warrant its use in the courtroom'." *Jakobetz*, 955 F.2d at 800 (citation omitted).

after *"DNA Matches"*). In addition, some commentators have cautioned against accepting overly permissive error rates, at least for false positives, in view of the high stakes involved in a criminal trial. *See id.* ("before deciding an error rate of, say, 1 percent is acceptable or even 'good,' consider the error rate that would be tolerated in a commercial airliner"). Nevertheless, we conclude that there was a sufficient showing of low error rates so that the third factor does not weigh against the admissibility of DNA profiling evidence.

Chischilly's seventh objection, that FBI procedures are insufficiently exposed to the light of peer review, deserves but does not withstand close attention under *Daubert's* second factor, relating to degree of publication. We note that in a learned opinion rejecting a claim that the FBI has failed to share its DNA testing data and methodology, the California Court of Appeals has commented upon the existence of "numerous published articles on DNA analysis as performed by the FBI." *Barney*, 8 Cal.App.4th at 813, 10 Cal.Rptr.2d 731. In addition, the NRC Report, frequently cited by Chischilly for its recommended improvements of the FBI's DNA analysis, is at least the functional equivalent of a publication subject to peer-review under *Daubert's* liberally framed second factor.

Chischilly's eighth, ninth and tenth objections, aimed at the FBI's statistical techniques for determining the probability of a coincidental match, are perhaps his weightiest against admission of DNA profiling evidence in this case. However, under *Daubert*, they fail to demonstrate that the district court abused its discretion by admitting into evidence testimony regarding the results of the FBI's DNA analysis. Chischilly asserts rather persuasively and with considerable

scientific backing that where an individual's DNA sample is tested against samples from a population in which persons of that individual's ethnic group are underrepresented, calculations based on the product rule [14] may tend to understate the probability that a random match would occur between the evidentiary sample and that individual's ethnic group. Chischilly called numerous experts who testified that the more homogeneous a population remains through intermarriage, the less random the relationship becomes between the coincidence of certain sequences of alleles at different test sites across the two samples (i.e., matches of nucleotide base pairs at given segments of the defendant's sample and the crime scene DNA). In analyzing the DNA evidence in this case, the FBI used its I–3 database, composed of DNA samples from Native Americans.[15] Nevertheless, Chischilly's objection remains because his distinct tribe (Navajo) may have been underrepresented in the I–3 database.

Chischilly asserts that, "[t]he scientific community is torn by controversy about the appropriateness of the FBI's databases, the effects of substructuring within their databases, and their statistical methodologies. This controversy has divided the scientific community into opposing camps." Chischilly goes on to cite studies offered by proponents of the FBI techniques and to note that "[b]oth sides of this continuing controversy find support in the journals and research, and both sides have prominent spokespeople." While perhaps support for exclusion of Chischilly's DNA test results under the superseded *Frye* test, with its requirement of general acceptance of a theory in the scientific community, these same statements take on the hue of adverse admissions under *Daubert's* more liberal admissibility test: evidence of opposing academic camps arrayed in

---

**14.** Whereas no two individuals (apart from identical twins) share the same overall DNA profile, "no individual has a unique profile *at a given locus.*" *DNA Profiling* at 488. Under the product rule the probabilities of finding a match at each given locus on the samples satisfying statistical criteria for a match are multiplied together to calculate the random probability that the trace DNA found at the crime scene could have come from another member of the population represented by the defendant.

**15.** It is only helpful to use an ethnic-specific database when it is reasonable to assume that the perpetrator of the crime is a member of that group. Crimes occurring in areas that are populated by a particular ethnic group are typical instances in which an ethnic-specific database will be used. Use of ethnic-specific databases generally strengthens the probative value of statistical data.

virtual scholarly equipoise amidst the scientific journals is scarcely an indication of the "minimal support within a community" that would give a trial court cause to view a known technique with skepticism under *Daubert's* fourth factor. —— U.S. at ——, 113 S.Ct. at 2797.[16]

Accordingly, we conclude that under *Daubert*, the three chief components of DNA profiling as performed in this case, sample processing, match determination and statistical analysis, pass muster under Rule 702. Nevertheless, we take seriously the Court's admonition in *Daubert* that scientific evidence must withstand close scrutiny under Rule 403. *Id.* —— U.S. at —— – ——, 113 S.Ct. at 2797–98. We therefore consider whether the probative value of the evidence is outweighed by its prejudicial potential. We will not reverse unless the district court abused its discretion in admitting the evidence. We conclude that it did not.

Notwithstanding *Daubert's* express preference for exposing novel scientific theories and methodologies to the glare of the adversarial process, *Daubert* enjoins watchful assessment of the risk that a jury would assign undue weight to DNA profiling statistics even after hearing appellant's opposing evidence, the testimony of Government witnesses under vigorous cross-examination and the careful instructions of the district court on burdens of proof. Of particular concern is where the Government seeks to present probability testimony derived from statistical analysis, the third main phase of DNA profiling. Numerous hazards attend the courtroom presentation of statistical evidence of any sort.[17] Accordingly, Rule 403 requires judicial vigilance against the risk that such evidence will inordinately distract the jury from or skew its perception of other, potentially exculpatory evidence lacking not so much probative force as scientific gloss.[18]

With regard to DNA evidence, there are two general tendencies that should be guarded against: (1) that the jury will accept the DNA evidence as a statement of source probability (i.e., the likelihood that the defendant is the source of the evidentiary sample); and (2) that once the jury settles on a source probability, even if correctly, it will equate source with guilt, ignoring the possibility of non-criminal reasons for the evidentiary link between the defendant and the victim.[19] As to the second concern, there is little chance in this case that the jury could have mistakenly equated source probability with guilt because it is clear that the evidentiary sample was criminally linked with the victim. The presence of sperm in the circumstances of this case undermined Chischilly's claim of innocence, as well as any hapless bystander or good samaritan defense, by clearly estab-

---

**16.** For additional commentary on the deadlock in the scientific community over DNA profiling see Risch & Devlin, *On the Probability of Matching DNA Fingerprints*, Science 717 (7 February 1992). For a recitation of cases forming the two sides of the judicial debate over the admissibility of statistical DNA profiling evidence under the *Frye* standard, see *Barney*, 8 Cal.App.4th at 820–21, 10 Cal.Rptr.2d 731.

**17.** For a similar instance outside the context of DNA profiling, see *People v. Collins*, 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33 (1968) (rejecting assumptions about the statistical probability of a couple other than the defendants having committed the crime being 1 in 12 million where several of the probabilities multiplied together, including hair and eye color, were obviously interdependent).

**18.** *See DNA Matches* at 223 ("[t]he expert can, with varying degrees of accuracy, estimate the frequency with which various characteristics might be expected to be found in a human biological sample. This information is probative, but an estimate of the probability that a defen-

dant is the source of a particular trace requires an estimate about the strength of the relevant nongenetic evidence as well. The failure to understand this principle probably has been, and will continue to be, responsible for findings against defendants who would have been successful at trial if the evidence had been presented properly").

**19.** *See* Lempert, *Caveats Concerning DNA*, 13 Cardozo L.Rev. 303, 306 (1991) (positing that "[u]nfortunately, the careless presentation of evidence ... may make it look as if the question of the rareness of the evidence DNA profile and the probability that the defendant's matching DNA is the source of the evidence profile are identical"); *DNA Profiling* at 515 (asserting that "juries often erroneously equate the frequency of the accused's blood type in the population with the probability of innocence, discounting the other evidence in the case pointing to guilt or innocence, such as the fact that a close relative is also suspected").

lishing a causal, and not merely a casual, link between the crime and the evidentiary sample.[20]

The first concern is somewhat more complex. The FBI matching statistic does not represent source probability. Rather, the test results reflect the statistical probability that a match would occur between a randomly selected member of the database group and either the evidentiary sample or the defendant. To illustrate, suppose the FBI's evidence establishes that there is a one in 10,000 chance of a random match. The jury might equate this likelihood with source probability by believing that there is a one in 10,000 chance that the evidentiary sample did not come from the defendant. This equation of random match probability with source probability is known as the prosecutor's fallacy.[21]

There is also a corresponding defense fallacy. Suppose there were 10,000,000 members of the group represented in the database used. The defense may claim that there is then only a one in 1,000 (10,000/10,000,000) chance that the evidentiary sample came from the defendant because 1,000 matches would occur if the entire population were tested. This claim resembles the prosecutor's fallacy in making an illogical leap, but differs in *understating* the tendency of a reported match to strengthen source probability and narrow the group of potential suspects.[22] Lying somewhere between the two, the real source probability will reflect the relative strength of circumstantial evidence connecting the defendant and other persons with matching DNA to the scene of the crime.[23]

Often acute even for Caucasian suspects, these pitfalls become more perilous where the defendant is a member of a substructured population, such as Navajo Indians. Underrepresentation of persons of like ethnicity in the profile data bases and questionable assumptions of allelic independence[24] may inflate the odds against a random match with the defendant's sample. In such a situation the jury may be ill-suited to discount properly the probative value of DNA profiling statistics.[25]

Geographic factors may further increase the potential of prejudice from the FBI's database selection. Although "the fact that certain alleles occur more frequently in the Navajos than they do in European and West African populations is of little consequence for a crime committed in Boston, where few Navajos reside,"[26] this fact is of considerable

**20.** We recognize that sperm found inside the victim could also be consistent with recent consensual sexual activity as well as sexual assault. However, the jury could reasonably have concluded that the additional presence of sperm on Ms. Tso's recently removed bra and the forcefully disheveled state in which she was found substantially ruled out the former possibility.

**21.** *See* Koehler, *Error and Exaggeration in the Presentation of DNA Evidence at Trial,* 34 Jurimetrics 21, 27 n. 24 (documenting instances where courts, commentators and expert witnesses have committed such source probability errors).

**22.** *See* Thompson & Schumann, *Interpretation of Statistical Evidence in Criminal Trials, The Prosecutor's Fallacy and the Defense Attorney's Fallacy,* 11 Law and Human Behavior 167, 170–71 (1987).

**23.** For further elaboration on the prospect of a jury confusing these probabilities, see *DNA Matching and Statistics* at 224–25 (warning against the possibility that such confusion might lead to mistaken convictions); *Caveats Concerning DNA* at 316, n. 34 (noting that "the question of whether the defendant is the source of the evidence DNA is not the same of whether the defendant is guilty of a crime.... [T]he defendant may be the source of crime scene DNA although he is innocent of the crime") (emphasis added).

**24.** "Allelic independence" refers to the absence of correlation between the inheritance of an allele controlling one genetic characteristic, such as eye color, with the inheritance of other alleles governing other traits and occurring at other loci.

**25.** *See Caveats Concerning DNA* at 308 (concluding that "juries are not ... in a good position to evaluate the problems posed by such subpopulations in their weighing of evidence"); *id.* at 307 (observing that "[i]t is now well recognized that due to population substructure, standard population data bases may not adequately represent the relative frequencies of polymorphic alleles in specific subpopulations").

**26.** Devlin, Risch & Roeder, *Statistical Evaluation of DNA Fingerprinting: A Critique of the NRC's Report,* Science 748, 749 (5 February 1993)

consequence for a crime committed on a reservation in Arizona, where many Navajos make their home. In such instances, the troubling possibility arises with singular force that the product rule, founded on the questionable premise of allelic independence at different test sites, will understate the random probability that some other nearby resident with a similar genetic profile could have been the source of the sample found on the victim.

On the other side of the Rule 403 ledger, statistical evidence derived from sample processing and match analysis, properly documented and performed in compliance with established, peer-reviewed laboratory protocols, is certainly probative of the defendant's guilt or innocence.[27] Where the district court provides careful oversight, the potential prejudice of the DNA evidence can be reduced to the point where this probative value outweighs it.

In this case, the district court provided such oversight, the prosecution was careful to frame the evidence properly and the defense was adequately equipped to contest its

validity. Confronted with an unusually informed, capable and zealous challenge from the defense, the Government was careful to frame the DNA profiling statistics presented at trial as the probability of a random match, not the probability of the defendant's innocence that is the crux of the prosecutor's fallacy. While not calculated pursuant to the NRC Report's controversial recommendation to adopt the ceiling principle[28], the one in 2563 probability that was introduced at trial was nonetheless arguably calculated on the basis of somewhat conservative statistical assumptions[29], was premised on the favorable assumption that the source of the sperm was a Native American[30] and was emphasized at the expense of a much smaller probability of a random match that Government witnesses testified would be statistically defensible.[31]

In sum, we conclude that the district court did not abuse its discretion in admitting the DNA evidence in this case. The evidence is admissible under *Daubert* and Rule 702. Moreover, the potential prejudicial effect in this case did not outweigh the probative value of the evidence under Rule 403.

(hereinafter *"Statistical Evaluation of DNA Fingerprinting"*).

**27.** *DNA Matches and Statistics* at 224 (suggesting that "[a]fter learning that a laboratory report indicates that trace evidence recovered from a crime scene matches the DNA profile of a defendant, factfinders in most cases should strengthen their beliefs that the defendant is the source of the trace and that the defendant is guilty of the crime").

**28.** Under the ceiling principle, as advocated by the NRC Report, in the statistical calculation phase each allele will be assigned a value equal to the greater of five percent or the highest frequency resulting from tests of the relevant population. (NRC Report at 12–13, 82–83, 95, 134). This procedure places what some scientists and statisticians regard as a rather conservative, arbitrary limit on the odds against a member of a given population having the same array of alleles at each locus tested. *See Statistical Evaluation of DNA Fingerprinting* at 749 (criticizing the National Research Council's suggestion that the ceiling principle be adopted for substructured populations).

**29.** Dr. Chakraborty testified that in calculating the one in 2563 probability, the FBI "follows something like ceiling principle (sic)" in that "they looked at the allele frequencies in several American Indian segment tribal populations and

picked up the one containing largest frequency (sic)."

**30.** As noted by Dr. Chakraborty in his testimony for the Government, calculations based on the data base for the American public at large could have reduced the probability of a random match by more than two orders of magnitude. Conversely, further "closing the window" through adoption of a strictly Navajo database, not yet established by the FBI, might have further *increased* the likelihood of a random match. However, undermining somewhat the significance of substructuring, the "raging controversy" over DNA profiling evidence also encompasses a dispute over the extent to which individual and ethnic differences, as opposed to differences among substructured groups, are primarily responsible for genetic diversity. *See Statistical Evaluation of DNA Fingerprinting* at 748.

**31.** Besides, even if the denominator in the one in 2563 probability should have been further reduced to guard against the risks inherent in a substructured population, "[i]t may well be that a match is so improbable that an exaggerated picture of its improbability caused by an inappropriate data base does not prejudice a defendant because the true probability would have been more than enough to persuade a jury that the defendant was the source of the evidence sample." *Caveats Concerning DNA* at 321, n. 44.

## V. The Nexus Between the Killing and the Underlying Felony

Chischilly maintains that insofar as he may have struck Sheila Tso accidentally, he lacked the intent to render her unconscious for the purpose of engaging in a sexual act, an element of the predicate offense, aggravated sexual abuse, under 18 U.S.C. § 2241(b)(1). The Government thus having failed to prove beyond a reasonable doubt that he killed the victim during the perpetration of aggravated sexual abuse, he contends, the district court's denial of his motion for judgment of acquittal constituted reversible error.

When reviewing a denial of a motion for acquittal, we view the evidence in the light most favorable to the Government to determine whether a rational finder of fact could believe that the defendant had been proved guilty beyond a reasonable doubt. *United States v. Brannan,* 898 F.2d 107, 109 (9th Cir.1990). So viewing the evidence, we find the record contained ample evidence from which a jury could reasonably have concluded that Chischilly knowingly rendered the victim unconscious and thereby engaged in a illicit sexual act with her under Section 2241(b)(1) as part of a single criminal episode culminating in Ms. Tso's death.

Chischilly revealed in an admissible statement that he had run a woman off the road. Dr. McFeely determined that the victim most probably lost consciousness, but did not immediately die, after being struck from behind. Officers Tyman's and Six's testimony as to the impact point on the grill of Chischilly's truck and the tire tracks found on the dirt road, indicating a sharp, deliberate U-turn immediately before the point of impact, supported a finding that Chischilly deliberately swerved in order to disable the victim. An abundance of evidence, including medical testimony, the DNA match and the similarity between mud found on Chischilly's pants and the soil around the victim, supported the inference that Chischilly intentionally engaged in a sexual act with an unconscious but still living victim who subsequently died as a result of injuries and exposure visited upon her by the perpetrator.

Viewed in the appropriate light and with sufficient deference to the jury's determination of credibility and factual conflicts, the record thus demonstrates that a rational fact finder could have found the evidence to prove Chischilly guilty beyond a reasonable doubt of having killed Sheila Tso in the perpetration of aggravated sexual abuse. In addition, the jury was adequately instructed that if it accepted the Government's case on the basis of this and other evidence presented, it could conclude that the acts of the defendant evidenced a malicious intent to commit the underlying offense of aggravated sexual abuse supporting a felony murder conviction.

## VI. Refusal to Give Manslaughter Instruction

Chischilly's sixth assignment of error contends that the district court, having instructed the jury on the elements of second degree murder as a lesser included offense of first degree felony murder, committed reversible error in refusing to instruct the jury on involuntary manslaughter, a lesser included offense of second degree murder. We review de novo a judge's refusal to give jury instructions on a lesser included offense. *United States v. Sneezer,* 900 F.2d 177, 178 (9th Cir.1990).

Chischilly's contention is uncompelling because, while manslaughter is a lesser included offense of second degree murder, *United States v. Lesina,* 833 F.2d 156, 159 (9th Cir.1987), neither involuntary manslaughter nor second degree murder is a lesser included offense of first degree *felony* murder, the only homicide offense with which the defendant was charged. Under *Schmuck v. United States,* one offense is necessarily included within another only when the elements of the lesser offense form a subset of the elements of the offense charged. 489 U.S. 705, 709, 109 S.Ct. 1443, 1447, 103 L.Ed.2d 734 (1989). Unlike second degree murder, conviction for felony murder under 18 U.S.C. § 1111 requires the commission of an enumerated felony with the requisite *mens rea* for the underlying offense. Obversely, second degree murder requires proof that defendant acted with malice aforethought, *Lesina,* 833 F.2d at 159, whereas

under a felony murder charge the commission of the underlying offense substitutes for malice aforethought. *Davis v. State of Tennessee,* 856 F.2d 35, 36 (6th Cir.1988). Therefore, the elements of second degree murder are not a subset of the elements of first-degree felony murder, for "each offense requires proof of an element that the other does not." *Whalen v. United States,* 445 U.S. 684, 693 n. 7, 100 S.Ct. 1432, 1438 n. 7, 63 L.Ed.2d 715 (1980) (discussing in dictum felony and second degree murder under D.C.Code).

Under the *Schmuck* test, second degree murder is thus not a lesser included offense of felony murder under federal law. Accordingly, the district court's decision to instruct the jury on second degree murder was a discretionary judgment to which Chischilly was not legally entitled. *See Woratzeck v. Ricketts,* 820 F.2d 1450, 1457 (9th Cir.1987) (rejecting appellant's contention that he was entitled to lesser included offense jury instruction on second degree murder where state law provided that second degree murder was not a lesser included offense of felony murder). Chischilly presented and we find no authority for the proposition that where a judge, as a matter of discretion rather than law, instructs the jury as to a lesser included offense of the crime charged, the judge must in turn instruct the jury as to the elements of a tertiary offense included within such lesser included offense. Accordingly, we reject the contention that the second degree murder instruction entitled Chischilly to further jury instructions.

## VII. The Imposition of Concurrent Life Sentences

Chischilly contends lastly that the two counts on which he was convicted, felony murder and aggravated sexual abuse, should have been grouped together under Section 3D1.2(a) and (c) of the Federal Sentencing Guidelines (the "Guidelines") and that the district court's reason for its departure was not stated with sufficient specificity to allow meaningful review. We agree.

■ At the sentencing hearing, defense counsel objected that "entry of an order of concurrent life sentences would be inappropriate" double-counting under the Guidelines. The district court conceded that this objection was "probably accurate" but insisted that "the Court's sentences stand subject to review." We review de novo a trial court's application of the Guidelines. *United States v. Restrepo,* 884 F.2d 1294, 1295 (9th Cir. 1989). The district court's sentencing determination does not withstand such review.

■ The text and commentary to U.S.S.G. § 3D1.2(a), the most directly applicable subsection of the Guideline governing the sentencing of closely related counts, support the accuracy of defense counsel's objection. Section 3D1.2(a) provides that multiple counts should be grouped together when they "involve the same victim and the same act or transaction."

The Government argues that rape, involving a distinct indignity and loss, "is not the same 'act or transaction' as being murdered." This argument has some intuitive appeal as a general proposition but is uncompelling in the context of Section 3D1.2(a) in light of the Sentencing Commission's commentary to this guideline. Instructively, note 3 of this commentary states that "double counting" should be avoided where two counts "represent essentially a single injury *or* are part of a single criminal episode or transaction involving the same victim," provided the counts arise from conduct occurring on the same day. U.S.S.G. § 3D1.2(a) n. 3 (emphasis added). The identity or severability of the harm inflicted pursuant to separately charged offenses is thus but one of the disjunctive prongs warranting grouping under the Guidelines. Accordingly, the Government's argument misses the point, especially compelling in the context of felony murder, that grouping under U.S.S.G. § 3D1.2(a) does not hinge solely on the severability of the harm occasioned by the related offenses. Rather, grouping may be premised on Section 3D1.2(a)'s alternative prong focusing on the unity of the criminal episode in terms of the time elapsed, objective pursued, fear instilled and risk created.

Example (2) to Note 3 offers a helpful illustration of groupable offenses and further belies the Government's argument that the

district court properly declined to group the offenses. Example (2) provides that where "[t]he defendant is convicted of kidnapping and assaulting the victim during the course of the kidnapping ... [t]he counts are to be grouped together." U.S.S.G. § 3D1.2 n. 3. Insofar as grouping would be appropriate notwithstanding the potentially distinct harms posed by kidnapping and assault, this illustration indicates that grouping is also appropriate for murder and aggravated sexual abuse, at least where they are inflicted contemporaneously on a single victim or result in an essentially single composite harm.

Here, the conduct giving rise to Chischilly's two life sentences constituted a single act, insofar as aggravated sexual abuse served as the underlying offense for Chischilly's felony murder conviction and, without a break in the sequence of criminal acts, was perpetrated at essentially the same time, in the same place, against the same victim and with a single criminal purpose.[32] The district court thus erred in its conclusion that for sentencing purposes under the Guidelines, felony murder and aggravated sexual abuse "were two separate charges and two separate offenses."

 The Government suggests in the alternative that, even if U.S.S.G. § 3D1.2 were applicable, the sentencing court established the basis for imposition of concurrent life sentences as a discretionary upward departure by commenting extensively on Chischilly's recidivism and psychopathic tendencies. To be sure, a central component of the broad sentencing discretion wielded by district court judges is the freedom to depart from the Guidelines, provided that specific reasons are provided to facilitate meaningful review. *United States v. Hernandez–Vasquez*, 884 F.2d 1314, 1316 (9th Cir.1989). Moreover, U.S.S.G. § 4A1.3 permits upward departures

where "reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes."

Section 4A1.3 might well have been applicable to a repeat offender such as Chischilly if the district court had considered granting an upward departure. It did not, either *sua sponte* or on the Government's motion. The district court's comments on Chischilly's criminal history and psychological state were not offered in support of an upward departure, a point the Government's argument obscures. Rather, after cataloguing Chischilly's past crimes, Judge Rosenblatt specifically concluded that "there is not a basis, based on your mental condition, which would warrant a *downward* departure." (emphasis added).

The grounds a sentencing judge deems to disfavor downward departure may not invariably be equated with those that would merit an upward departure. Of course, some circumstantial factors may simply be neutral, or may weigh in favor of a sentence falling squarely within the guideline range. Other factors may tip the scale against a departure at one margin of the range without prompting a departure in the opposite direction at the other.

Here, the potential divide between non-mitigating and aggravating factors is traversable only through conjecture, as Judge Rosenblatt did not frame the imposition of two concurrent life sentences as an upward departure. It follows *ipso facto* that the sentencing judge offered no rationale in support of such a departure which might sustain the additional sentence against appellate review. *See* 18 U.S.C. § 3553(c)(2); *Hernandez–Vasquez*, 884 F.2d at 1316. We decline to specu-

---

**32.** Serving as the underlying offense for Chischilly's murder conviction, the victim's death during the commission of the aggravated sexual abuse offense obviated specific intent to kill and accordingly was chargeable as felony murder under 18 U.S.C. § 1111 without a separate criminal objective. However, we do not suggest that the "same act or transaction" analysis under U.S.S.G. § 3D1.2 is identical to the determination in the felony murder context governing whether the killing occurred during the *res gestae*

of the underlying felony. Rather, in assigning error to the district court's failure to group the charges of conviction, we note that here the aggravating circumstance of the sexual abuse charge, rendering the victim unconscious with a truck in order to facilitate her rape, not only supplied the constructive intent to murder, but was also the proximate cause of Ms. Tso's death. The two counts of conviction were thus intertwined sufficiently to merit a single sentence under U.S.S.G. § 3D1.2(a).

late as to whether the reasons offered by the district court for not reducing Chischilly's sentence would have served the dual purpose of enhancement in the hypothetical event that the sentencing judge had considered granting an upward departure. Accordingly, we reverse the sentencing judge's failure to group the charges of conviction under U.S.S.G. § 3D1.2.

## CONCLUSION

For the foregoing reasons, we affirm Chischilly's conviction of murder and aggravated sexual abuse under 18 U.S.C. §§ 1111, 1153 and 2241(b)(1) and vacate the additional sentence of life imprisonment imposed on Count II, aggravated sexual abuse.

NOONAN, Circuit Judge, dissenting:

On January 18, 1979, Chischilly was indicted on four counts of unlawful "sexual contact" with four separate women during 1978 and 1979. On April 9, 1979, a competency hearing was held in the Superior Court of Yavapai County, Arizona, at the end of which the court ruled "that the defendant is incompetent, that he does not understand these acts, and that he cannot assist counsel in his defense." Therefore the judge dismissed the charges of sexual contact without prejudice.

On October 14, 1983, Chischilly was sentenced in a state court in New Mexico for aggravated battery and attempted murder. He was ordered to be imprisoned for six years; the court recommended that he also be moved as early as possible to the state hospital for long-term mental health treatment.

On February 21, 1990, he was indicted in this case for murder and aggravated sexual abuse. The case came on for trial before the federal judge who, as an Arizona state judge in 1979, had found him incompetent, unable to understand the nature of his acts, and unable to assist in his own defense. Chischilly asked this judge to determine that he was incompetent to stand trial in this case. In the course of preparing for argument on the motion, counsel discovered the judge's previous rulings. Chischilly then filed a motion under 28 U.S.C. § 455 asking the judge to

disqualify himself. Counsel for Chischilly argued that the standard is an objective one, which requires recusal when a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned. Counsel reminded the judge of his 1979 decision and observed that the charges in 1979 were similar in nature to the offenses with which he was charged here. Counsel also observed that since 1979 Chischilly had been "involved in a continuing series of similar incidents." Counsel argued that "it would be normal for any judge" to look back and rethink the decision made in 1979 and that "it would be virtually impossible" for the judge to ignore what he had done then. No other judge, counsel contended, would have to ask himself, "Did I do the right thing?"

The government opposed the motion. The prosecutor argued that the judge was "in a better position than any other judge to handle this matter." Counsel for Chischilly responded that what had happened was "probably a judge's worst nightmare," having to look back and say, "If only I hadn't released this person, maybe we wouldn't be here."

After hearing the arguments, the judge said that he had not released Chischilly, that "there is a statutory procedure provided for the determination of competency and the court followed that, and so there would be no worry on the court's part that it made the right—wrong determination at that time. It did not." The judge said that he had no independent recollection of the 1979 proceedings and "only vague recollection of the name Chischilly." He added, "The one way you can survive in this business is by making your decisions and moving on down the line and not reflecting on them as the years go by." Finally, the judge noted that the nature of the job was "to see the same defendant in different circumstances in different cases.... If the logic of this motion were carried far enough, it would mean that a judge could only sit on the case of one defendant once...." The judge denied the motion to recuse himself.

*Analysis.* The standard to be applied is determined by 28 U.S.C. § 455. Subsection (a) of the statute declares, "Any justice,

judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Subsection (b), in relevant part provides, "He shall also disqualify himself in the following circumstances: (1) Where he has a personal bias or prejudice concerning a party, or a personal knowledge of disputed evidentiary facts concerning the proceeding."

Precedent instructs us, "Section 455(a) and (b)(1) are to be construed together when the ground for recusal is the bias or partiality of the trial judge." *United States v. Winston,* 613 F.2d 221, 222 (9th Cir.1980); *United States v. Olander,* 584 F.2d 876, 882 (9th Cir.1978), *vacated on other grounds sub nom. Harrington v. United States,* 443 U.S. 914, 99 S.Ct. 3104, 61 L.Ed.2d 878 (1979). Under the statute the standard is "an objective one." *Winston,* 613 F.2d at 222. That is, the trial judge is required to recuse himself only when "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Id.* Under the statute, and using the established standard, our inquiry is not as to the subjective state of mind of the judge. Our inquiry is as to whether a reasonable person would conclude that the judge's impartiality might reasonably be questioned.

What we are required to do as a court reviewing the judge's exercise of discretion in a matter where the statute speaks peremptorily is not to determine what this particular judge thought or experienced. We are asked to determine what a reasonable person would believe as to the personal bias of such a judge in such circumstances. The judge's own comments, like the arguments of counsel, are only clues to help us in making such a determination—a determination doubly difficult because bias involves an emotional inclination as well as a mental outlook, and it is not easy to determine objectively what emotions a reasonable person might reasonably feel.

Suffice it to say that a reasonable person here would note that this is not a case where the judge's bias, if it existed, would have arisen from the performance of his duties as a federal judge. It would have arisen from the performance of his duty as a state judge. In that way the source of the putative bias was extrajudicial, that is, outside the judicial system in which the judge was acting. Logic would not require a federal judge in this situation to recuse himself where he had earlier dealt with the defendant in a federal case. *See Liteky v. United States,* — U.S. —, —, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994) (expression of anger by "imperfect men and women, even after having been confirmed as federal judges," does not constitute extrajudicial bias or show such a high degree of favoritism or antagonism as to make fair judgment impossible). Logic, however, would require recusal if a judge had presided over a defendant's state trial and the defendant later sought federal habeas corpus from the same judge now translated to the federal sphere.

A reasonable person would note that the bias, if it existed, did not arise "during the course of the proceeding." *Pau v. Yosemite Park and Curry Co.,* 928 F.2d 880, 885 (9th Cir.1991). It does not come "solely from information gained in the course of the proceedings." *Matter of Beverly Hills Bancorp,* 752 F.2d 1334, 1341 (9th Cir.1984). It was not knowledge "obtained in the course of earlier participation in the same case." *Winston,* 613 F.2d at 223.

A reasonable person would also note that this is not a case where the judge had presided at a state competency hearing, forgotten it, and later presided unselfconsciously at a federal competency hearing. The circumstances of the state hearing were here brought forcefully to the judge's mind.

A reasonable person would further note that denial of responsibility is normally a sign of conflict and embarrassment and that here the judge denied responsibility for Chischilly's release. It was the procedure not the judge that was responsible. "It is the law, not I, condemn your brother"—Angelo's words to Isabella in *Measure for Measure* are classic in denying responsibility for what has to be the act of the judge, however much that act is in conformity with law. The denial suggests suppressed tension and turmoil. A reasonable person would infer that any judge in these circumstances would ex-

perience the tension and turmoil of conflicting emotions.

A reasonable person would note that this is not a case where one competency hearing followed another with nothing intervening. Here, after being released in Arizona, Chischilly committed heinous crimes in New Mexico. But for the Arizona release, would he have been in a position to commit them? The question is a fair one, one that would occur to anyone. The question does not reflect upon the lawfulness of the release but does suggest that the release had significant costs of which a reasonable judge would personally now be aware.

A reasonable person would ask if he would want to be tried in such circumstances by a judge who already had once let him go, and the reasonable person would answer that it would be a misfortune to come again before a judge who, following statutory procedure, had once before released him. The ordinary person's reluctance to come before such a judge under such circumstances is a reflection of the normal belief that such a judge would not be impartial. The prosecutor's claim that the judge was "in a better position than any other judge" would not be reassuring.

A reasonable person would observe that Chischilly was now charged with awful crimes and dismissal of these charges on the grounds of competency would put him in a . position where he would have the opportunity, not available if he were convicted of the crimes, of convincing some official of his recovered sanity and again gaining freedom. A reasonable person would infer that a judge in such circumstances was under pressure to reaffirm his original findings as to a man who had only gotten worse with the passage of time, and that he was also under pressure not to let Chischilly free to commit some new outrage as he had in New Mexico after being released from criminal custody in Arizona. One pressure would make him overly responsive to Chischilly, the other overly responsive to the prosecution. A reasonable person would say these pressures were not imaginary and speculative but psychological and moral—what any ordinary, decent human being sitting as a judge would be expected to

feel in such an odd situation. A reasonable person could not say whether one pressure would balance out the other. A reasonable person would conclude that one or the other pressure might predominate and, whichever did, the judge's impartiality was reasonably open to question.

The judge was being called upon to make an extremely difficult and delicate judgment affecting a defendant accused of horrible conduct. The circumstances of the ruling he was being asked to make made bias as to the defendant's competency peculiarly dangerous. The judge's discretion was limited by the peremptory language of the statute. The judge, the statute says, "shall disqualify himself" once the objective facts are present. The duty of disqualification was not an option he could choose to exercise or not exercise.

Blackstone took the position that the judges of England were beyond recusal. "For the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea." 3 William Blackstone, *Commentaries on the Laws of England,* \*361. In the United States the law supposes the possibility. The statute has shattered the judge's freedom from question. We should apply the statute.

As I do not believe the trial should have gone forward under the judge to whom it was assigned, I do not reach the other difficult discretionary questions raised on this appeal.